1              **UNITED STATES DISTRICT COURT**

2                    **DISTRICT OF IDAHO**

3
                                  )
4    UNITED STATES OF AMERICA,     )  CASE NO. 4:12-CR-00302-WYD
                                  )
5              Plaintiff,          )  **JURY TRIAL DAY 1**
                                  )  OPENING STATEMENTS
6         vs.                      )
                                  )
7    MAX SPATIG,                   )
                                  )
8              Defendant.          )
                                  )
9    _____ )

10

11          **TRANSCRIPT OF PROCEEDINGS – VOLUME 1**
              **BEFORE THE HONORABLE WILEY Y. DANIEL**
12             **TUESDAY, JUNE 2, 2015; 8:48 a.m.**
                    **POCATELLO, IDAHO**

13

14   **FOR THE UNITED STATES OF AMERICA**
            Michael J. Fica
15          Adam Cullman
            US ATTORNEY'S OFFICE
16          801 E. Sherman, #192
            Pocatello, ID 83201
17
     **FOR DEFENDANT**
18          Randolph B. Neal
            LAW OFFICE OF RANDOLPH B. NEAL
19          482 Constitution Way, Ste. 222
            Idaho Falls, ID 83402-3568
20

21
     Proceedings recorded by mechanical stenography, transcript
22   produced by computer.
     _____
23

24          **TAMARA I. HOHENLEITNER, CSR 619, CRR**
            FEDERAL OFFICIAL COURT REPORTER
25       550 WEST FORT STREET, BOISE, IDAHO  83724

2

**I N D E X**

| Date | Proceeding | Volume–Page |
|------|-----------|-------------|
| 06/02/2015 | Jury Trial Day 1 | 1 – 1 |
| | Opening statement by the government...... | 1 – 29 |
| | Opening statement by the defense......... | 1 – 35 |

1                   P R O C E E D I N G S

2                      June 2, 2015

3          (Prospective jurors absent.)

4          THE COURT:  All right.  Good morning.  Have a seat.

5          Well, fortunately or unfortunately, all of you look the

6    same whether you're here in person or over the video.

7          For the record, this is United States of America vs.

8    Max Spatig.

9          Will counsel enter their appearances.

10              MR. CULLMAN:  Adam Cullman for the United States.

11              MR. FICA:  Your Honor, Mike Fica on behalf of the

12    United States.

13              MR. NEAL:  Randolph Neal on behalf of Mr. Spatig.

14              THE COURT:  Who is at counsel table for the

15    government?

16              MR. CULLMAN:  This is Agent Darin Mugleston of the

17    EPA.

18              THE COURT:  Right.  And he is going to be your

19    advisory witness through trial?

20              MR. CULLMAN:  Yes, Your Honor.

21              THE COURT:  And I would note Mr. Spatig is here.

22          I want to -- there are some preliminary matters we'll do

23    real quickly, and then we'll get the jury in so we can get

24    started.  So I want to have Ms. Fulwyler give each of you -- I

25    have a revised set of jury instructions and special verdict

1    form, one to each side, and this is predicated on what was

2    discussed at our May 14th trial preparation conference and then

3    the submissions provided by the government.  So we incorporated

4    those in this set, and what I want you to do is look at these

5    over the next day because I want to make a record earlier in the

6    trial as to whether or not there are any further objections to

7    these jury instructions and the special verdict form.  On the

8    special verdict form, we just added -- made it clear that they

9    only check one of the three options, which I think was a good

10   point raised by Mr. Cullman.

11        So anyway -- and, really, this won't be in lieu of a formal

12   charge conference that we'll do near the end of the trial, but I

13   want to just get your input as to whether or not you have any

14   other comments on the preliminary instructions that are in front

15   of you.

16        And then during jury selection, there is a preliminary

17   instruction I'm going to read -- and, actually, I got it from

18   Judge Winmill, but it's routine.  But then I'm also going to

19   read some of these jury instructions that have a relationship to

20   some criminal procedural rules that are important from my

21   perspective.

22        So the first one I'm going to read is No. 3, which says,

23   "The indictment is not evidence" and all of the things that

24   belong in No. 3.  No. 4, "The defendant in a criminal case has a

25   constitutional right not to testify" and the rest of that

1          instruction.  No. 5, which is the instruction on proof beyond a

2          reasonable doubt and everything that's in 5.  Instruction No. 6,

3          which tells them the evidence they can consider.  And then,

4          finally -- let's see -- just 3, 4, 5 and 6.

5               And so if you have any other preliminary instructions you

6          want me to give from this set, let me know, but those are the

7          ones that I think are most important.  I don't want to get into

8          all of the elements and all of that at this point.

9               And then as part of the preliminary instruction, I'm going

10         to read the indictment, which I have in front of me, and I told

11         you I was going to do that.  And then I always make it clear to

12         the jurors who are in the courtroom but are not in the box they

13         need to listen carefully to these preliminary instructions

14         because we will have replacement jurors because of the exercise

15         of peremptory challenges, and I don't want to have to repeat all

16         that again.  In a summary way, I'll ask them if they have heard

17         the initial introductions and the jury instructions and if they

18         have any issues about any of that, and then we'll proceed to

19         follow-up questions when we get to that.

20              So the way I normally do this at the beginning is -- she

21         will give a longer opening, Ms. Fulwyler, when I come out, and

22         then I'll introduce myself in a way that makes it clear I am

23         here as a visiting judge.  Then I'm going to introduce the

24         members of the court staff who are actually in the courtroom,

25         and then I'm going to turn to counsel for the government to

6

1      introduce those persons at your counsel table.

2           And which of you should I introduce, Mr. Fica or

3      Mr. Cullman?

4                MR. CULLMAN:  Mr. Cullman.

5                THE COURT:  Okay.  All right.

6           And then I'm going to direct you, Mr. Cullman, to read your

7      list of witnesses, the witnesses whom the government is likely

8      to call.  Then, obviously, I'm going to direct the prospective

9      jurors to -- to tell us if they know any of these people.

10               MR. CULLMAN:  Yes, sir.

11               THE COURT:  And then I'll remind those in the audience

12     to make a note if they know anybody.  And then I'm going to do

13     the same thing with Mr. Neal, to introduce himself and the

14     defendant.

15          Now, obviously, because the defendant has an absolute right

16     not to call any witnesses or even present evidence, I always

17     want to clarify before we bring the jury in, Mr. Neal.  Do you

18     have any third-party witnesses that you know you're going to

19     call?  Because if you do, I want their names read just to make

20     sure prospective jurors don't know them.  If you're reserving a

21     right about whether to call witnesses and you don't know at this

22     time, then you have a right to say -- to tell me that you don't

23     want to do that.

24          So what is your preference?

25               MR. NEAL:  I believe the court has our witness list.

1     I don't have any problem if the court wants to read that.

2          THE COURT:  No.  I want you to read it.  It's my

3     practice -- I prefer to have counsel read it rather than the

4     court because these aren't my witnesses; they are your

5     witnesses.

6          MR. NEAL:  Very good.

7          THE COURT:  So then I would like you to read your

8     witnesses.  And, again, I'll make it clear that the defendant

9     has an absolute right not to testify, the defendant doesn't even

10    have to present any witnesses, but it's possible that the

11    defendant may call some third-party witnesses, and then I'll ask

12    Mr. Neal to read those witnesses.  So you should be prepared

13    then to read the witnesses that are on your list, and then we

14    want to know do any of the jurors know them.

15         All right.  And so then, after we have dispensed with that,

16    I will then go into the voir dire.

17         Now, as you know, Rule 24 of the Federal Rules of Evidence

18    provides for a couple things.  While I am not going to allow a

19    direct questioning by the attorneys -- unless you have a real

20    simple question that's just as easy for you to ask it as me to

21    ask it -- when I sort of finish my voir dire or if there

22    is -- then I want to have the attorneys come up to sidebar, and

23    if you want me to ask some follow-up questions of particular

24    jurors, then I will invite that, and I will do my best to ask

25    it.  And, again, if it's something that I think it's better for

1    you to ask rather than me, I'll let you ask those questions.

2         And then as you know, regarding the alternate jurors,

3    Rule 24 -- Rule 24(a)(3) makes it clear -- well, a couple

4    things.  Let me go to Rule 24(a)(4).  "Each side is entitled to

5    a number of additional peremptory challenges to prospective

6    alternate jurors specified below.  These additional challenges

7    may be used only to remove alternate jurors."

8         So we have decided, as you know, that we will have two

9    alternates -- and the numbers which they should know about but

10   you need to make sure and remember -- are 7 and 11.  And there

11   is one additional peremptory challenge permitted when one or two

12   alternates are impaneled.  So, obviously, that's what the rule

13   provides, and that's what will happen.

14        And I didn't mention this at the final trial preparation

15   conference, but it's my practice in all criminal trials when we

16   reach the end of the trial and the jury is going to deliberate,

17   I do not excuse the alternate jurors.  I retain them pursuant to

18   what is noted in Rule 24(b)(3), and that reads as follows:

19        "The court may retain alternate jurors after the jury

20   retires to deliberate.  The court must ensure that a retained

21   alternate does not discuss the case with anyone until that

22   alternate replaces a juror or is discharged.  If an alternate

23   replaces a juror after deliberations have begun, the court must

24   instruct the jury to begin its deliberations anew."

25        And, obviously, what that means -- I will read this rule to

1    the jurors and tell them they need to keep themselves insulated

2    from any information about the case, to continue to avoid

3    discussing it with other folks, and if for some reason one of

4    the primary jurors becomes infirm or disabled or can't continue,

5    then one or both of them may be called.

6          Now, if that were to happen, then they would be called in

7    the order they were selected; so alternate No. 1 would be the

8    first replacement juror, and alternate No. 2 would be the

9    second.  And, again, if an alternate is called after the

10   deliberations have begun, I would then instruct the jury to

11   begin its deliberations anew.

12         So any objection to anything I have just said about any of

13   that?

14               MR. CULLMAN:  No, Your Honor.

15               MR. NEAL:  No.

16               THE COURT:  Mr. Neal?

17               MR. NEAL:  No, Your Honor.

18               THE COURT:  All right.  Now, are there any other

19   preliminary questions that anyone has?  Because what I want to

20   do is I'll go back to chambers, and then we'll bring in the

21   jurors and we'll get started.  Any preliminary questions about

22   how we're going to do this jury selection?

23               MR. CULLMAN:  Nothing from the government.

24               MR. NEAL:  Nothing on jury selection.

25         As far as opening statements, what is the preference of the

1      court?

2              THE COURT:  Well, let me tell you what I would do back

3      in my home court, which is configure it a little bit

4      differently, but it has, obviously, some of the same general

5      characteristics.

6          If you, obviously, want to be at the lectern, you can.  If

7      you want to be closer to the jury, then I would let you sort of

8      be parallel with counsel table but sort of no closer than where

9      Mr. Fica is.  So you can stand there.  The only thing I ask that

10     you do is not pace.  It's just so -- if you -- some attorneys

11     have a tendency to pace back and forth.  It's just irritating.

12     But if you want to stand closer to the jury but not any closer

13     than where Mr. Fica is, I'll let you do that, but that's totally

14     up to you.  But you need to make sure you're speaking into a

15     microphone if you would like to move away from the lectern.

16         So tell me what your preferences are.

17             MR. NEAL:  Well, I don't want to be speaking over

18     counsel, so my preference would be either the lectern -- and I

19     don't know if it's mobile.

20             THE COURT:  Further back?

21             MR. NEAL:  I would prefer to be over here as opposed

22     to talking over the counsel table.

23             THE COURT:  Well, you could stand in front of the

24     lectern, if you wanted to, Mr. Neal.

25             MR. NEAL:  I think they have a portable microphone

1    they use for that purpose as well.  I think that's available to

2    us.  That will be my --

3             THE COURT:  Okay.  So if you want to stand in front of

4    the lectern and speak into a microphone, that's fine.  I have no

5    objection to that.

6             What about --

7             MR. CULLMAN:  Yeah, that's fine.  I prefer to stand in

8    front of the table and if we can bend one of the microphones

9    over.

10            THE COURT:  That's fine.  Yeah.  You don't have to be

11   tied to the lectern, but I don't want you to get close to the

12   jury because I think that's inappropriate.  All right.

13            And what did we decide on the length of the opening

14   statements?  I know we talked about that.  Was it 40 minutes?

15            MR. CULLMAN:  The government asks for 40.  We won't be

16   using that much time.

17            THE COURT:  That's right.  That's right.  Obviously, I

18   gave the defendant the same amount.

19            All right.  So let me just tell you what our goal is today

20   -- and we will accomplish this.  We will pick a jury today, and

21   at least the opening statements and depending upon how long it

22   takes to pick a jury, we may do that, have opening statements

23   and actually begin the evidence portion.  And how long a jury

24   selection takes is really a function of what issues, if any, the

25   jurors have, the degree -- how long it takes me to do my

1    questioning and then whether or not you use all your

2    peremptories and you choose not to, but that's totally up to

3    you.

4         So with that said, there any other preliminary matters

5    before we have the prospective jurors brought into the

6    courtroom?

7         These are not prospective jurors, I don't believe.

8              MR. CULLMAN:  Nothing from the government, Your Honor.

9              MR. NEAL:  No, Your Honor.

10             THE COURT:  We'll be in recess.

11        (Recess at 9:01 a.m. until 9:07 a.m.)

12        (Prospective jurors present and voir dire commenced.)

13             THE COURT:  We're going to take a break for 20

14   minutes.  The only thing I order you to do is not have any

15   discussions about this case.  We will come back later and talk

16   about why that's important.  We'll resume in 20 minutes.

17             MR. NEAL:  May we meet for a minute, maybe in chambers

18   so we can discuss an issue?

19             THE COURT:  An issue related to jury selection or

20   another issue?

21             MR. NEAL:  With Mr. Spatig.  I just have an issue I

22   would like to raise.

23             THE COURT:  All right.  We'll take a break, and let me

24   have counsel come up to sidebar.

25        (At sidebar on the record.)

1          THE COURT:  What's the issue?

2          MR. NEAL:  At the pretrial, we asked the marshals

3     about hearing aids.  Mr. Spatig can hear through the microphones

4     with the, you know, these muffs, the earmuffs, but he is unable

5     to hear me.  He has been reading my lips so as far as any kind

6     of -- there is two issues going on there.

7          THE COURT:  Hold on.  I want the marshal to listen to

8     this, too.  Let me ask somebody from the Marshals Service to

9     come up.

10         Start again.

11         MR. NEAL:  All right.  So at the last pretrial, we

12    asked about hearing aids.  I asked if I needed to follow up on

13    that and the newer marshal here -- I don't know his last name --

14    said that he would follow up on that.  I also went to the jail,

15    the Bingham County Jail, and asked them about if anything had

16    been -- this was last week -- had been initiated to ensure that

17    if he needed hearing aids he has hearing aids.

18         The issue with him with these earmuffs is that he can only

19    hear those things that -- it only magnifies those things that go

20    over the court sound system.  So it does nothing when I lean

21    over -- in fact, if anything, it impedes my ability to

22    communicate with him.  He not only cannot hear me, he has to

23    read my lips, but ultimately, it also has made it so that he is

24    loud, and so when he is talking to me, he has no idea of what

25    volume he is speaking, and so some comments are getting picked

1    up on the microphone, comments are potentially, you know, being

2    overheard by the jury.  And I did ask about these hearing aids,

3    and they said that no hearing aids got brought to the jail.

4         That -- that was -- that was -- you know, that was -- that

5    was just not what I was asking to have please happen here in the

6    last two weeks; I believe that in the custody of the marshals,

7    there was a requirement for him to have a medical -- this kind

8    of medical issue addressed.  And whatever hearing aids he had in

9    Bingham County were taken away, and apparently there was no

10   personal property that was retained when he was sent to Seattle.

11   We have -- I have no knowledge whatsoever of whatever happened

12   to anything that he had at Bingham County when he left to go to

13   Seattle.

14        So nothing was done in the last two weeks.  He doesn't have

15   hearing aids.  He can't communicate with me, and when he does

16   communicate, you know, it's potentially inappropriate, and it's

17   getting caught on both the microphone and potentially overheard

18   and affecting the jurors.

19        I don't know why this issue wasn't addressed over the last

20   two weeks.

21             MARSHAL:  Can I --

22             THE COURT:  Yeah, please.

23             MARSHAL:  Here we have our documentation.

24             THE COURT:  Say who you are for purposes of the

25   record.

1           MARSHAL:  Seth with the United States Marshals.  This

2      is our 129, which is documentation of everything that medical

3      does, medicines that are given to him, et cetera.  Any time that

4      there is a request, there is what's called a PMR, a prisoner

5      medical request, which has to be done because it has to be

6      approved for us to do anything.  So the first step that would

7      happen if an attorney had asked, and it wouldn't be to us, it

8      would be for his client at the facility if that were done, it

9      would be documented on it.

10          So I don't know if he has an email or another

11     documentation, but we have none, and so what would happen at

12     that point -- the jail then would send a PMR, prisoner medical

13     request, and then for hearing aids in this instance, then he

14     would be seen by a hearing doctor, and he would be tested on

15     that to verify what he needs, if he does need hearing aids.  If

16     he did, then another PMR or prisoner medical request would be

17     then requested and sent in for approval from our medical

18     prisoner operation division, which they would supply him with

19     the hearing aids.  But that's the step that would have to be

20     done.  He would have to be seen by --

21          MR. NEAL:  We need the other marshal apparently,

22     because specifically I asked him if there was anything else that

23     I needed to do, and he said he would take care of it and address

24     it.

25          THE COURT:  Let's do this.  I obviously don't want any

1   delay here, but I want to see if there is a way to get him some

2   hearing aids on an expedited basis.  Is that possible?

3           THE MARSHAL:  There would have been two steps:  The

4   PMR for the doctor to be seen to get tested for his hearing;

5   then a second PMR to actually have the specially-made hearing

6   aids, and that honestly could take months to have the hearing

7   aids.

8           MR. CULLMAN:  Adam Cullman, Department of Justice.

9      I believe he has historically had hearing aids.  Now I know

10  there is a reference in the file that he has lost them in the

11  past.  I don't know if that's what happened here.  I don't know

12  if that would expedite the process, but I guess --

13          THE MARSHAL:  I asked him if he had hearing aids, and

14  he says that Mr. Cook with the Sheriff's Office at Bonneville --

15  Officer Cook said when they arrested him, they must have fallen

16  off.  That's what he said.

17          MR. NEAL:  He has had hearing aids in this room, and

18  my understanding is he had hearing aids at the Bingham County

19  Jail, but that the change from custody in one location -- and

20  this is what the marshals told me, not Bingham County -- the

21  marshals told me they don't retain any personal property.  And

22  so when he was transferred up to Seattle, whatever he had at the

23  Bingham County Jail was not retained.

24          THE COURT:  Well, what are you proposing, Mr. Neal,

25  that we do?  Obviously, we don't -- it's going to be impractical

1    to go through the procedure that Seth mentioned to get him here.

2    That would be a two-month delay.

3         So what --

4         MR. NEAL:  I would have raised this issue at least two

5    weeks ago if the response to me was, you know, it would take

6    months for us to get that accomplished.  That wasn't the

7    response we had, and that wasn't the response I had at Bingham

8    County.  But Bingham County said, okay, we will put in whatever

9    their version of the PMR is, but then, you know, a couple days

10   later, he is transferred from Bingham County down to Bannock

11   County.  So whatever was initiated at Bingham County I'm sure

12   was stopped because he is no longer in their custody.  Whether

13   Bingham County initiated something with the marshals or would

14   have to, I don't know.

15        THE MARSHAL:  He was only transferred just yesterday.

16        THE COURT:  From?

17        THE MARSHAL:  From Bingham County.  It was literally

18   just yesterday that was in preparation for this trial.

19        MR. NEAL:  I'm not talking about that.  I talked to

20   the folks at Bingham County last week, maybe Tuesday, maybe

21   Thursday, and they said, okay, if he needs to get in to see the

22   hearing doctor, we'll get him in.  So, yeah, whatever was

23   started at Bingham County was shut off yesterday, the day --

24   whenever he was transferred.  Nobody is accusing anybody.

25        MR. CULLMAN:  So has he had hearing aids recently or

1    is this simply like --

2              MR. NEAL:  The best I can tell -- and I think, Darren,

3    you were the one who was telling me this -- is that he had

4    hearing aids at Bingham County prior to going to Seattle.

5              MARSHAL LAMBERT:  Your Honor, I apologize.  My name is

6    Darren Lambert with the U.S. Marshals Service.  I have been

7    working on this this morning, and we have no history of hearing

8    aids being in his property.  We checked his intake records this

9    morning.  There is nothing documented there.  We contacted the

10   Bingham County Jail this morning.  There have been zero

11   complaints of hearing issues is what they are telling us this

12   morning.

13        We are reviewing policies trying to figure out what we can

14   do to try to get hearing aids addressed.  What we're

15   understanding is that if Max had hearing aids prior to coming

16   into custody, none of the facilities have heartburn with him

17   bringing hearing aids in so he can use them inside the facility.

18   If he had them prior to his arrest, what we're learning in

19   speaking with headquarters this morning, Your Honor, is that

20   unless he had a hearing aid in custody and he damaged, broke,

21   destroyed that hearing aid while in custody, it appears that

22   they won't buy him hearing aids for a pretrial custody.  So if

23   he has an outside prescription, we will gladly accommodate if

24   the family will pick them up or bring them in.  The jail will

25   absolutely let him have them, but there have been zero requests

1      to Bingham as of this morning.

2              MR. NEAL:  Which I know not to be true, personally.

3              THE COURT:  We are going to push the start of this

4      back to 11:30.  I'm going to order all of you to talk off the

5      record and see if we can resolve this, but in the meantime, it

6      seems as if Mr. Spatig can hear what's going on.  I would

7      suggest that perhaps you and Mr. Spatig and Mr. Neal have an

8      arrangement where you are sharing handwritten notes with one

9      another.

10             MR. NEAL:  We are trying to accomplish that.  I think

11     the court has been distracted a couple of times.

12             THE COURT:  I have not heard him.  So far.  I haven't

13     heard anything.  See if you can work this out.  We're going to

14     take our break now.

15          (Recess at 11:09 a.m. until 11:33 a.m.)

16          (Prospective jurors present; voir dire continued.)

17          (Recess at 1:06 p.m. until 2:22 p.m.)

18          (Prospective jurors present; voir dire continued.)

19          (Jury sworn/impaneled.)

20             THE COURT:  So what we're going to do is take a

21     15-minute break, and when we come back we're going to have

22     opening statements, and after the opening statements, we'll be

23     through for today, and we'll start with the evidence portion of

24     the trial first thing tomorrow morning.

25          You may be seated.

1          So the jurors who have not been called are excused and free

2     to go.  Is that correct, Ms. Fulwyler?

3               THE CLERK:  Yes, Your Honor.

4               THE COURT:  And then the 14 of you should go to the

5     jury room.  You will be given notepads, and we'll start again in

6     about 15 minutes with opening statements.

7          Yes?

8               MR. CULLMAN:  We would like to meet with the court, I

9     guess, before we get back into session.

10              THE COURT:  Okay.  About?

11              MR. CULLMAN:  Just for a few minutes.

12              THE COURT:  All right.  Okay.  You have an issue.

13    Does it have anything to do with jury selection?

14              MR. CULLMAN:  No, Your Honor.

15              THE COURT:  All right.  Well, why don't we do it now

16    after the jurors leave.

17         Marcus, take them to the jury room, please.

18         (Jury absent.)

19              THE COURT:  All right.  What's your issue?

20              MR. CULLMAN:  I just wanted to clear with the court

21    that I plan on using photographs and also defendant's statements

22    in opening statement.

23              THE COURT:  What photographs are we talking about?

24    Will they be exhibits?

25              MR. CULLMAN:  They will be.

1           THE COURT:  They haven't been admitted, have they?

2           MR. CULLMAN:  They have not been admitted.  Obviously,

3     the time to challenge authenticity has passed under the

4     procedural orders of the court, so I believe there is no basis

5     for them to be objected to.

6           THE COURT:  Well, let me have you identify by exhibit

7     number the photographs you want to use, and I can see if there

8     is any objection from Mr. Neal.  Which photographs?

9           MR. CULLMAN:  Exhibit 4, Your Honor.

10          THE COURT:  4.  All right.

11          MR. CULLMAN:  10, 30 -- 10 and 132.

12          THE COURT:  132?

13          MR. CULLMAN:  And also 34, Your Honor.

14          THE COURT:  So let me just ask this question:

15    Obviously, they are not in evidence, but do you believe you have

16    the ability to lay a foundation to get these in evidence if

17    there is an objection to their use now?

18          MR. CULLMAN:  Yes, I do.

19          THE COURT:  So if there is an objection now, that I

20    would insist and order that you make it clear that these have

21    not been received in evidence and that -- because, I mean, so

22    really they are demonstrative exhibits at this point because

23    they can't be exhibits that have been received in evidence.

24       What is your position on these pictures?

25          MR. NEAL:  They are highly prejudicial.  I mean,

1    before the issue of publication to the jury is ever decided

2    during the evidence portion of it, we would have a full

3    opportunity to explore foundation, to describe context; this

4    would be highly prejudicial for them at this stage.  To get them

5    to unring the bell later I think is nearly impossible.

6              THE COURT:  Well, I have a concern.  In trials, what I

7    would do -- even in criminal trials -- if the parties stipulate

8    to the exhibits and they are received, then the jury can see

9    them in opening statements, but they haven't been stipulated to.

10   I'm not going to let you use these photographs in opening,

11   because I think -- in looking at these, I think they are

12   prejudicial.  So you can't use the photographs.  You can

13   obviously describe them.  You can say, if you choose to, through

14   the government's intent to introduce evidence, it will

15   demonstrate some things, but if Mr. Neal objects to these now, I

16   do agree that until they come in as lawful exhibits with a

17   proper foundation --

18             MR. CULLMAN:  May I be heard?

19             THE COURT:  Sure.

20             MR. CULLMAN:  Well, the standard would be whether they

21   were unduly prejudicial and unfairly prejudicial, and these are

22   simply photographs of, essentially, the crime scene.  We have

23   witnesses who not only can describe that this was, in fact, how

24   the crime scene looked; we will, for some of these, have the

25   very person who took the photographs.  So while I understand

1    that he views them to be prejudicial to his client, he has not

2    voiced any unfair prejudice to his client by these photographs.

3           THE COURT:  Well, let's just assume for purposes of

4    this ruling that there is a legal objection to one of these

5    photos coming in -- I'm not saying there is, I don't really

6    know.  I'm not going to let you use these photographs if he

7    objects during opening.  So you need to verbally describe them,

8    and, obviously, the government isn't prejudiced because if they

9    ultimately come in, the jury will see them.  So if he objects,

10   I'm not going to let you use them.

11          All right.  What else?

12          MR. CULLMAN:  The defendant's statements, Your Honor.

13          (Inaudible colloquy.)

14          THE COURT:  Hold on.  Mr. Spatig, don't talk, please.

15          All right.  So what statement are you referring -- what

16   statements are you referring to?

17          MR. CULLMAN:  He made two statements to contractors

18   that were on the site.  The first statement was that he buys

19   material in lots, he takes the good stuff somewhere else, and

20   brings the bad stuff back to Rexburg.  The second statement was

21   that the EPA would -- also to the same contractor -- that the

22   EPA would be back to clean up his property again free of charge

23   in a couple of years.

24          THE COURT:  Well, let me ask a question:  Do you have

25   a witness who will testify to these statements being made?

1           MR. CULLMAN:  I do, Your Honor.

2           THE COURT:  All right.  So I think that the only way

3      you can use those in opening -- you need to indicate that a

4      witness will testify that the defendant stated as follows, and

5      then if you don't, obviously, follow up on that with admissible

6      evidence, then -- then there is a credibility issue.  But I

7      can't foreclose you from reference to the statements the

8      defendant made because they aren't hearsay because they were

9      made by a party.  So I have no objection.

10          Do you have an objection, Mr. Neal, for the record?

11          MR. NEAL:  If he is simply describing testimony, I

12     don't think I have a valid, good faith objection as to him

13     describing anything in opening statement.

14          THE COURT:  I agree with that, but I'm giving you a

15     chance -- if you had objected, I would have overruled it.  So I

16     think you can reference any statements that you can actually get

17     into evidence through the testimony of witnesses.  But on the

18     photographs, again, it's my practice not to allow photographs in

19     unless they are already in evidence, so you just need to

20     describe them.

21          All right.  Anything else?

22          MR. CULLMAN:  No, Your Honor.

23          THE COURT:  Okay.  All right.

24          So let me ask the court reporter, how much time do you need

25     for breaks, on recess?  How much time do you need?

1              THE COURT REPORTER:  At least 10 minutes.

2              THE COURT:  We'll start in 15 minutes, 10 or 15

3      minutes.

4          (Recess at 4:08 p.m. until 4:25 p.m.)

5          (Jury absent.)

6              THE COURT:  Are we ready to proceed with opening

7      statements?

8              MR. NEAL:  I have one issue that I would like before

9      the jury returns --

10             THE COURT:  What's that?

11             MR. NEAL:  -- just to put on the record about jury

12     selection.

13             THE COURT:  Go ahead.

14             MR. NEAL:  Thank you.

15         Your Honor, we had one -- one -- a juror that through the

16     selection process was able to be seated, and then, you know, we

17     had literally no way to respond after we did do a motion to have

18     her removed for cause.  You know, whether that was -- that was

19     sufficient for cause or not -- the second issue there is this is

20     someone we certainly would have used a peremptory, but because

21     of the system that we used, we were not able to use our

22     peremptory, and so I think that leaves a juror that at least we

23     have a concern that has some pre- -- is predisposed towards a

24     certain verdict and leaning towards a certain direction that may

25     affect the client.

1          You know, at this point, I know the court has used this

2     system, and I hate to be criticizing that system in this manner,

3     but I think it's appropriate in my client's interests to make

4     sure that -- you know, if we don't raise this issue now, it's

5     certainly nothing that we could use later.

6          I'm also kind of concerned that if there was an influence

7     on the verdict because Ms. Severe didn't follow through on the

8     promises made to the court, it would be difficult to impeach the

9     jury's verdict because we wouldn't be able to use anything that

10    happened in the room.  I mean, she could go to extremes in there

11    and cause issues, but we would never be able to properly address

12    that.

13         So we make that objection to the way that the jury was

14    selected for the purpose of the record.  And I realize the court

15    has probably used this system just dozens and dozens of times

16    and is very comfortable with it.  So I don't mean to, you know,

17    upset the court that we're -- that I'm making the complaint, but

18    I think it's important to raise the objection for the purpose of

19    the record.

20              THE COURT:  Does the government wish to respond for

21    the record?

22              MR. FICA:  No, Your Honor.

23              THE COURT:  So let me just respond for whatever it's

24    worth.  Obviously, when Ms. Severe was called as a replacement

25    juror, the defendant had already used up all of his ten

1    peremptory challenges, which is all that are authorized by

2    Rule 24.  And you made a motion to excuse her for cause, the

3    government asked a follow-up question, and my ruling was that

4    there wasn't a basis for -- to excuse her for cause.  And it

5    would be a violation of Rule 24 for the court to have allowed

6    the defendant to have peremptory challenges beyond 10.  It has

7    nothing to do with the system.  It has to do with the fact that

8    you used your peremptory challenges, and you only had 10.  And

9    so that's just the way it works.

10          Anyway, all right.  Let's bring the jury in, and we'll

11    proceed with opening statements.

12          (Jury present.)

13          THE COURT:

14          So let me make a suggestion.  When all of you line up next

15    time, let's line up so that you're coming in in the order of

16    where you are seated so you don't have to walk beyond each

17    other.  And then what I would prefer is that all of you come in

18    in the right order, and then let's just wait until everybody is

19    in, and now you may be seated.

20          (Discussion off the record.)

21          THE COURT:  So it came to my attention -- I don't have

22    my formal charge here but one, two, three, four -- is it

23    Ms. Jones?  Who needs to eat every two hours?  What is your

24    name, please?

25          JUROR NO. 88:  It's Jaynes.

THE COURT: Jaynes.

JUROR NO. 88: I'm okay.

THE COURT: So -- well, no. Tell us why you need to eat every two hours because I want to make sure --

JUROR NO. 88: I'm diabetic.

THE COURT: Okay. All right.

So we will take breaks -- we won't go more than about an hour and 40 minutes before we take the break, so if you can do your best to eat on breaks, that would be --

JUROR NO. 88: I can go three hours if I have to. That's fine.

THE COURT: Okay. That's fine. If you could eat on breaks, that would be great.

So I'm going to allow the jurors to take notes, but let me read an instruction on note-taking.

If you wish, you may take notes to help you remember the evidence. If you do take notes, please keep them to yourself until you and your fellow jurors go to the jury room to decide the case. Do not, however, let the note-taking distract from being attentive. When you leave -- leave court for recesses, your notes should be left in the jury room. No one will read your notes. Whether or not you take notes, you should rely on your memory of the evidence. Notes are only to assist your memory. You should not be overly influenced by your notes or those of your fellow jurors.

1          That's the instruction that applies to note-taking.

2          All right.  We will now proceed with the opening

3     statements.  And please remember the opening statements as you

4     will hear in the course of my instructions and as has been

5     alluded to in earlier instructions are not evidence.  It's just

6     a preview of what the evidence may be.

7          All right.  So the government may proceed with its opening

8     statement.

9               MR. CULLMAN:  Thank you, Your Honor.

10         Good afternoon.

11         We are here today because the defendant, Max Spatig, the

12    operator of a concrete refinishing business known as

13    MS Enterprises, chose to store and dispose of thousands of

14    containers of hazardous waste on his property in Rexburg.

15         Throughout this trial, you will see pictures documenting

16    the hazardous waste where it had been left and abandoned by the

17    defendant.  In these photos, you can see not only that the waste

18    was hazardous bearing labels such as "flammable," "corrosive,"

19    and "poison," but also that it was, in fact, waste.

20         In these photos, you can see that the waste was overgrown

21    with weeds.  It was rusting, it was leaking, it was corroding,

22    and it was everywhere.  The defendant had piled it up throughout

23    the property.  He had piled it into abandoned vehicles, into

24    outbuildings and sheds, and strewn it about on the ground

25    throughout his property in Rexburg.

1          Now, the defendant knew that it was waste.  Not only was he

2     the one who dumped it on the property and left it there, but he

3     was experienced with these materials.  As I said, he had a

4     business which related to these materials, as you'll hear

5     throughout the trial.

6          Now, in addition, you will hear from a witness that the

7     defendant explained where the material came from.  He told this

8     witness that he bought material in lots, took the good stuff

9     someplace else, and brought the bad stuff back to Rexburg.

10    That's what this material was.  That's what this waste was.  It

11    was the stuff that he didn't want after he bought stuff in lots.

12    He kept the good stuff someplace else.  He brought the bad

13    stuff, and he dumped it on the property in Rexburg.

14         Furthermore, the evidence will show the defendant knew the

15    law that prohibited his storage and disposal of hazardous waste

16    on his property.  How do we know this?

17         There was, in fact, an earlier cleanup of different

18    property the defendant owned in Menan in Jefferson County.  This

19    earlier cleanup occurred in 2005.  And you will hear from the

20    inspectors who visited with the defendant frequently throughout

21    that time, and they will tell you that they explained the law to

22    the defendant, they told him what it prohibited, and they told

23    him how he needed to treat his hazardous waste.  But the

24    evidence will show that as soon as they were finished on the

25    property in Menan, the defendant proceeded to do the exact same

1      thing, this time in Rexburg.

2           Now, I want to talk about some of the witnesses the

3      government expects to call and some of the evidence we expect to

4      admit.

5           You will hear from a Mr. Todd Heyrend who lived next to the

6      defendant's property in Rexburg for a number of years.  He will

7      tell you that he complained on several occasions about the

8      defendant's storage and disposal of hazardous chemicals.  He

9      will also tell you that it was, in fact, the defendant who left

10     the containers, who left the materials strewn about the

11     property.  He will also describe his interactions with the

12     defendant.

13          You will also hear from Detective Mike Courtney.  He works

14     for the Madison County Sheriff's Office, and he first responded

15     to a site on a nuisance call.  He will show you a video that he

16     took of the property upon arrival.  He will also describe his

17     interactions with the defendant, and he will tell you exactly

18     what it was that he saw on the site that caused him to call

19     hazmat and the Idaho Department of Environmental Quality.

20          You will also hear about the steps taken to confirm that

21     the waste was indeed hazardous, although, as I said earlier that

22     many of the containers bore labels such as "flammable,"

23     "corrosive," and "poison," many others were in such a state of

24     decay due to being left outside for so long that the on-site

25     responders had to first test the materials to figure out what

1    exactly they were working with.  You will hear from those

2    responders.

3         After you hear from the responders, you will hear that

4    samples were taken and sent to a laboratory.  The chemists at

5    the laboratory will come in, and they will tell you why it was

6    the defendant's waste was hazardous.  These wastes fall into two

7    basic categories:  There is ignitable waste, and there is

8    corrosive waste.  The chemists will tell you that the corrosive

9    waste is measured using something called a pH scale, which you

10   may know about.  It goes from zero to 14.  Anything with a pH

11   that's either too low or too high is corrosive.  You will hear

12   that, for instance, anything with a pH of less than or equal to

13   2 is hazardous because it's an acid.

14        The chemists who tested the defendant's waste will tell you

15   that his waste samples were so acidic they couldn't get a

16   reading of over a zero without diluting over 20 times.  It was

17   so acidic it was essentially falling off the end of the pH

18   scale.

19        You will also hear about ignitable waste.  Ignitable waste

20   is measured using something called flash point, which you will

21   hear more about at the trial, but it's basically the temperature

22   at which a substance will ignite if -- the vapors emitted by the

23   substance will ignite in the presence of a spark.  You will hear

24   from the judge that anything with a flash point of less than

25   140 degrees is deemed hazardous.  You will hear from the

1    chemists that most of the defendant's wastes was so ignitable

2    that the flash point was closer to 70 degrees when they tested

3    it.

4         Finally, as mentioned earlier, you will hear that this was

5    not the first time the defendant stored and disposed of

6    hazardous waste requiring others to clean it up.  Now, why is

7    this relevant?  It's relevant because it shows the defendant's

8    knowledge.  He knew it was prohibited because he was told what

9    was prohibited.

10        You will hear from the state inspectors that were

11   responsible for the 2005 incident.  They will tell you they had

12   extensive discussions with the defendant about how he needed to

13   handle and treat his hazardous waste.  They also told him that

14   he could keep a small portion of his materials but only if it

15   was not waste, only if it was in good condition, if it wasn't

16   rusted or leaking, or, essentially, if it didn't look like the

17   materials that you will see that he had at Rexburg.  They told

18   him that he could keep these materials but only on the condition

19   that he find a suitable storage location.  And you will hear the

20   defendant then rented a storage locker for just that purpose, so

21   that he could keep the good materials that he had on his

22   property in Menan.

23        Now, we anticipate that the defendant may try to suggest

24   that he was insane at the time of the offense and that you

25   should find him not guilty for that reason.  I won't spend much

1      time on this because the judge will instruct you as to how to

2      assess such a claim.  But I will note that insanity is an

3      affirmative defense that the defendant must prove to you by

4      clear and convincing evidence.  The government does not bear the

5      burden of proving that the defendant was insane; rather, he

6      bears the burden of proving that he was sane.

7           Once all the evidence is in, you will see not only that the

8      defendant treated his property as an unpermanent hazardous waste

9      site, but also that there was no mistake, there was no

10     confusion.  The defendant knew his material was waste, and he

11     knew it was hazardous.  He also knew the law and what it

12     prohibited; he simply chose to ignore it.

13          At the end of this case, the government will ask you to

14     reach the only verdict consistent with the evidence, and that is

15     a verdict of guilty on the single count of storing or disposing

16     of hazardous waste.

17          Thank you.

18               THE COURT:  Hold on, Mr. Neal, before you -- Marcus --

19     off the record.

20          (Discussion was had off the record.)

21               THE COURT:  Now, with the understanding that the

22     defendant does not have to make an opening statement, Mr. Neal,

23     do you wish to make an opening statement?

24               MR. NEAL:  Yes, Your Honor.

25               THE COURT:  You may proceed.

1          MR. NEAL:  We have been instructed we have to stay in

2     a certain place and not pace, and in order to do that, I think

3     I'm going to have to anchor myself or else I'll start wandering.

4          THE COURT:  Well, I didn't order.

5          MR. NEAL:  Well, I'm sorry.

6          THE COURT:  I discouraged it.

7          MR. NEAL:  It annoys the judge, and we don't want to

8     annoy the judge.  But I don't want you to think I'm casual

9     either.  I know how serious and important this is.

10          Normally, I don't take a moment like this to thank the jury

11     because I think that tends to sound so insincere, but this

12     morning at 7:30 in the morning when I showed up, I saw a few

13     folks already here, and I could tell because of their license

14     plates which have the county, you know, designated -- for the

15     judge's benefit -- you know what I'm talking about, the letters

16     and the numbers -- and some folks, obviously, have traveled a

17     tremendous distance and did so at a very early time.  This area

18     that you guys come from for the federal jury selection is just

19     immense, all the way from Island Park and Salmon and, you know,

20     down to Preston and clear over to Mini-Cassia.  So I think that

21     is something that it's appropriate to be thanking you for and

22     expressing gratitude for.

23          It is a civic duty.  I know that you take it seriously.

24          I know that there is a lot of preconceptions and a lot of,

25     you know, ideas about what you're probably going to be

1    experiencing.  Some of you have already experienced that by

2    being on a jury, and maybe it met your expectations, maybe it

3    didn't.

4        I'm -- you know, as I explain Max's story to you, as we

5    intend for it to be presented, you know -- you know, often we

6    come into these situations talking about two sides to -- there

7    is two sides to every story.  There isn't a story that doesn't

8    have two sides, you know, those kind of things.

9        Well, this isn't about two sides of the story because the

10   story is whatever it is; right?  The truth is the truth.

11   Whatever happened in this case is whatever happened.  It's not a

12   question of changing what happened.  It's not a question of

13   trying to present it in some light that is going to be easily

14   recognizable.

15       What we have here is many voices.  You will be hearing

16   voices for the next several days, most of them from witnesses

17   that will be explaining the part of the story that they know.

18       The thing that I think that every juror has a duty to do,

19   however, is to carefully watch for those who their voices may be

20   louder, they may sound a little more slick, they may be more

21   polished.  That may -- that doesn't necessarily indicate that

22   their piece of the story or what they perceived as their piece

23   of the story is any more accurate than anyone else.  So as you

24   hear these voices -- and in some cases, these voices come

25   silently.

1        You know, when I -- just as introduction, my name is Randy

2    Neal.  I'm a private attorney now.  But for -- this is my second

3    career.  I was -- for 17 years, I was in federal law

4    enforcement, and I remember sitting much where Agent Mugleston

5    is sitting as the case was being prosecuted.  One of the first

6    times I was in a courtroom like this, and the defense attorney

7    was of some renown, and he came in and started talking about how

8    he loved trials and the smells and the odors and the sights and

9    the sounds, and I had no idea what he was talking about.  It

10   sounded like, you know, nonsense.  And he later -- he later had

11   some problems with addictions that were probably on display that

12   day, but, you know, some of what he said I understand a little

13   bit now.

14       See, there is already voices that are being -- that are

15   affecting those influences going on that you may not recognize.

16   You have come into a room that is one of the most ornate that --

17   you know, of any government building in Idaho.  You know, I was

18   half tempted to bring in a step ladder and raise my hands as

19   high as I could to see if I could touch the ceiling.  It's not

20   because we have elephants for exhibits in here.  The furnishings

21   and the very serious people and the very serious, you know,

22   clothing -- all of this is meant to have an impact.  This is all

23   very serious.  Right?  And that's already started.  That's

24   already started.  It's already started to influence you, that

25   the federal government has gone to incredible lengths here.  We

1    have a mention of how much money was spent.  That's already

2    beginning to influence even though none of that is evidence.

3        The fact is that regardless of this charge being made and

4    regardless of how much expense and regardless of how expansive

5    and impressive the surrounding is, the story can be quite

6    simple, and it's not going to be a crime no matter how much

7    people want it to be or in their perception think it is.  And

8    that's the scrutiny that you're -- as a juror, you have a duty

9    to apply to the people that come in here, these voices that you

10   will be hearing over these next few days -- to whether these

11   folks really have the ability to tell the story.  Not the side

12   of the story, the story.  What is the truth?

13       I anticipate -- and, you know, we'll see whether Max

14   testifies based on the presentation of the United States.  As

15   you've heard, he is not required to.

16       And just so you know who Max is:  Max is 73 years old.  He

17   is a widower.  His wife died.  She had a stroke, complications

18   from diabetes.  That was in 2010, a few months after this.  This

19   occurred in July of 2010.  In fact, during the five years

20   preceding this, after Max's wife had a stroke, is when his

21   business, basically, got put on hold while he was caring for his

22   wife.

23       The business that we're talking about, this concrete

24   finishing business is -- if we had a counter up for right now

25   how many times you have heard the words "hazardous waste," I

1    mean, it's just absolutely been driven into your minds.  His

2    business was painting.  For four decades he painted.  He would

3    paint whatever people would pay him to paint.  He would paint

4    your house if had you the money and wanted him to do it.

5        But where he developed kind of a niche was this specialized

6    paint, painting on concrete floors.  And I think all of us have

7    probably seen this in garages and dealerships.  They are bright,

8    they are -- they have a gray floor there.  They are clean.  They

9    give off that impression, you know, kind of like an impression

10   that you get from a room like this, that this is a dealership

11   that really knows its business and it's being clean and run

12   professional, you know, as opposed to that dingy garage that has

13   muck all over the floor.

14       Well, to prepare that concrete, there are certain chemicals

15   that are used, preparation chemicals.  And so, yeah, he has

16   things that will help him prepare that surface, and then he has

17   the paint that's used to paint it gray.  And that's what we're

18   talking about.  Some of those projects were large, and some of

19   those projects were yet to be fulfilled when his wife had the

20   stroke.

21       So, yeah, we're talking about a lot of paint.  We're

22   talking about some associated lacquer thinner, some other

23   stripping agents that help, you know, prepare that concrete.

24   What we're talking about is stuff that this -- this man didn't

25   want to throw away.  This is stuff that he wanted to make money

1    off of.  It was his profession.  And each time he did a job, he

2    would take part of the profit, and he would buy product for the

3    next job.  But the next job didn't come because of

4    intervening -- this wasn't a -- this wasn't a company that had

5    trucks and logos.  This was a man that was going into his

6    sixties who used his sons and his daughter and his, you know,

7    his brother or whoever was available.  That was -- that was this

8    business, this MS Enterprises.

9         So when they came calling on this property, you will hear

10   what their perception of what they were looking at, but that

11   wasn't Max Spatig's perception.  Max didn't want to throw this

12   stuff away.  Max wanted to use it in the business that he had

13   been using it for for 40 years.

14        Now, it's going to be -- it's going to be hard to sort

15   through what Max knows and what's being presented as a piece of

16   the story by these folks that -- I mean, you're just going to be

17   imagining they're in lab coats and they have beakers and

18   bubbling, you know, Bunsen burners and whatever, test tubes and

19   all this kind of thing.

20        But it comes down to a simple question of this 73-year-old

21   widower doing the best that he can to make a living and whether

22   or not this stuff was the kind of stuff that he needed a permit

23   for, or most importantly, that he could recognize this is the

24   stuff -- I mean, this is -- this is in a condition now that

25   we're going to have to consider it waste.

1          Now, the real -- the real question here, as you listen to

2     this evidence, is going to really focus around not what these

3     impressive people with resumes and so forth can do in a

4     laboratory, but what a normal person who has been around the

5     stuff would believe whether this stuff had gone to waste or not.

6     I mean, that's really the question.

7          This is not a case about nuisance.  This is not a case

8     about improper zoning.  This is not a question of whether he

9     made a mess or his neighbors didn't like the way that it looked.

10    But that's one of the voices.  That will be perhaps multiple

11    voices that will be heard, that people didn't like the way it

12    was stored; they didn't like the look of the property.  Pictures

13    will be shown.  Perhaps that will be something you wouldn't want

14    next to you, but that's not the crime.  That's not what he is

15    charged with.

16         It will be important for you to pay close attention to what

17    is charged and what is not.  You know, it would be improper for

18    a jury to listen to the evidence and then go to the jury room

19    and say, well, maybe he didn't do this, but he did something

20    wrong.  They have to prove beyond a reasonable doubt the charge

21    that they brought, not have you fill in the blanks.

22         If we had two candidates sitting here in front of you

23    today, and one had a million dollars and he had banners and he

24    had slick television ads and he had, you know, people with PR

25    skills, and then the one standing next to him was an old,

1        73-year-old, you know, individual with mental health issues --

2                MR. CULLMAN:  Objection, Your Honor.  This is

3        argumentative at this point.

4                THE COURT:  Well, I can't tell because he hadn't

5        finished what he was about to say.  So I'm going to overrule the

6        objection, but I encourage you, Mr. Neal, to make sure you are

7        not arguing because these are opening statements.  So I'll

8        overrule that objection at this time.

9                MR. NEAL:  One voice would probably be heard much

10       better than the other.

11           As you listen to these -- this trial, as you listen to the

12       voices of the witnesses, and even the influences of these

13       pictures and so forth, it's important that rather than two sides

14       of the story, perhaps, that every voice is heard.  And that's, I

15       guess, my responsibility today as Max's voice, but perhaps it's,

16       when Max has his opportunity to speak, if he chooses to, that

17       would be his chance for his voice to be heard.  It will be a

18       weak voice.  It may not be entirely coherent.  It may not sound

19       slick and smooth, but, ultimately, his voice deserves to be

20       heard.  He is the defendant.  Anybody in his shoes deserves to

21       be heard just as equally as the government, the accusers, those

22       who want to paint a picture in a certain way.

23           And I think that at the end you will find that the story

24       that -- that Max has to tell combines all of the truth because

25       he has all of the pictures.  He has all the pieces of the

1 puzzle.  He has all of the -- he knows his own intent, and

2 that's something that others are only guessing at.

3   So I ask you to scrutinize carefully the information that

4 you receive, in a sense the influence that's unseen, that this

5 is serious business.  I agree, it is serious.  The folks here

6 that are in this jury box certainly seem to be taking it

7 seriously.

8   And as his voice, at this moment, listen carefully, because

9 there is going to be, you know, a lot of voices that are going

10 to be easier on the ears.

11   THE COURT:  All right.  There is one additional

12 instruction I'm going to read.  Let me explain.  At least in

13 Colorado -- I can't speak for what has happened in Idaho in

14 criminal cases.  But we have had situations in Colorado where

15 jurors have inappropriately used the Internet to find

16 information about a case or about a party, and it's created

17 problems.  In fact, it created a mistrial in a case of one of my

18 colleagues, and the jurors had been instructed that they had to

19 limit their knowledge to what is presented in the courtroom.

20 You can understand that because what each of you should base

21 your factual decisions on as jurors has to be what is presented

22 in court rather than what you may read on the Internet or may

23 hear outside of court.

24   So there are two related points here.  One is that you are

25 ordered by me not to have conversations between and among

1       yourselves until you deliberate or to have conversations with

2       other human beings about this case until after you are

3       discharged.

4            Now -- so I'm going to read an instruction that will be in

5       the final set, and then I'll amplify it.  But it goes this way:

6            In your deliberations, your duty is to apply my

7       instructions of the law to the evidence that you have seen and

8       heard in the courtroom.  You are not allowed to look at, read,

9       consult, or use any material of any kind, including any

10      dictionaries, or medical scientific, technical, religious, or

11      law books, the Internet, or any material of any type or

12      description in connection with your jury service.  I want to

13      emphasize that you must not seek or receive any information

14      about this case from the Internet, which includes Google,

15      Wikipedia, blogs, and any other website.  You are not allowed to

16      do any research of any kind about this case.

17           During your deliberations, you must not communicate with or

18      provide any information to anyone by any means about this case.

19      You may not use any electronic device or media, such as a

20      telephone, cellphone, smartphone, iPhone, BlackBerry or

21      computer, the Internet, any Internet service, any texts or

22      instant messaging service, or any Internet chat room, blog, or

23      website such as Facebook, MySpace, LinkedIn, YouTube, or Twitter

24      to communicate to anyone any information about this case or to

25      conduct any research about this case until I accept your

1      verdict.  In other words, you cannot talk to anyone on the

2      phone, correspond with anyone, or electronically communicate

3      with anyone about this case.  You can only discuss the case in

4      the jury room with your fellow jurors during deliberations.  I

5      expect you will inform me as soon as you become aware of another

6      juror's violation of these instructions.

7           You may not use these electronic means to investigate or

8      communicate about the case because it is important that you

9      decide this case based solely on the evidence presented in this

10     courtroom.  Information on the Internet or available through

11     social media might be wrong, incomplete, or inaccurate.  You are

12     only permitted to discuss the case with your fellow jurors

13     during deliberations because they have seen and heard the same

14     evidence you have.  In our judicial system, it is important that

15     you are not influenced by anything or anyone outside of this

16     courtroom; otherwise, your decision may be based on information

17     known only by you and not your fellow jurors or the parties in

18     the case.  This would unfairly and adversely impact the judicial

19     process.

20          So as a practical matter, what this means -- this means I'm

21     telling you and ordering you not to snoop about anything

22     regarding the defendant, about the prior history of this case,

23     or do anything that expands on what you receive in the

24     courtroom.  If you do that and get discovered, you have some

25     severe negative consequences that would occur to you, and it

1    could probably result in a mistrial; and that would not make me

2    happy, and it wouldn't make your fellow jurors happy.  So,

3    please, stay away from any investigation or research, avoid any

4    communications with anyone about this case, and remember that

5    all of your information must come from what you learn in the

6    courtroom as jurors.

7         I'm sure you will follow that because it makes a lot of

8    sense, but I need to warn you because it's so tempting to go on

9    the Internet and start snooping, but you are ordered by me

10   through this instruction and my clear words not to do it.

11        All right.  So we are going to be in recess until 9:00 a.m.

12   tomorrow, so please be here so we can start promptly at 9:00.

13   And then we'll take one short, midmorning break, and we'll break

14   for lunch around 12:00 to 12:10, in that time frame, and then

15   we'll go through the afternoon.  And my goal would be to end

16   around 5:00.  We may go a little past 5:00 if we need to finish

17   a witness.  And then we'll have trial tomorrow, which is

18   Wednesday, Thursday, and then we'll have Friday trial until

19   maybe 2:30.  I'm going to adjust Friday because my law clerk and

20   I have to take a plane back to Denver that leaves from Idaho

21   Falls at 5:20, so we need to leave in time to drive to Idaho

22   Falls, check our bags, and make the plane.  But I'm coming back

23   Sunday late afternoon, so we will start bright and early Monday

24   morning, so we have full days next week.  So I will see you

25   tomorrow morning, and again we'll start promptly at 9:00 a.m.

1    So have a good evening.

2        (Jury absent.)

3        THE COURT:  There was an instruction in the set I gave

4    you this morning.  It's Instruction 31.  Mand I initially

5    thought that we needed to add what I said about notes, but I

6    don't think we do because Instruction 31 says as follows --

7    reads as follows:

8        Some of you have taken notes during the trial.  Whether or

9    not you took notes you should rely on your memory of what was

10   said.  Notes are only to assist your memory.  You should not be

11   overly influenced by your notes or those of your fellow jurors.

12   That's essentially what I said here, so I think 31 is adequate,

13   and I don't think we need to add another instruction.

14       Do both sides agree with that?

15       MR. NEAL:  Yes.

16       MR. CULLMAN:  Yes, Your Honor.

17       THE COURT:  All right.  So, again, remember to look at

18   these, and I'm probably going to ask you not later than Thursday

19   if you have any further comments, because I want to make sure we

20   have a final set of instruction to the maximum extent possible

21   subject to being changed next week when we have a charge

22   conference after we have heard evidence.

23       MR. FICA:  Judge?

24       THE COURT:  Yes.

25       MR. FICA:  One other matter that just came to mind

1    when you cautioned the jury as they left together.  The

2    Ninth Circuit has recently prepared a stock cautionary

3    instruction on the use of Internet and social media.

4              THE COURT:  Is it similar to what I read?

5              MR. FICA:  It is similar, Your Honor.  And there is

6    some recent case law that suggests that a trial court should

7    give that instruction at the close of evidence every day.  I am

8    happy to get that instruction and supply it to the court.

9              THE COURT:  Sure.  Why don't you do that.  Why don't

10   you do two things:  Get it to me but then compare it with what I

11   read.

12             MR. FICA:  Certainly.

13             THE COURT:  And decide if it's different enough that I

14   should read it or does this suffice and, again, I'm not -- I

15   don't have any problem --

16             MR. FICA:  Sure.

17             THE COURT:  -- with changing what I read with the

18   understanding this actually came from the AO, this instruction.

19   So with all --

20             MR. FICA:  It may be the exact same instruction.

21             THE COURT:  No.  But I'm happy to receive it.  Show it

22   to Mr. Neal, and I want to know if he has any objection.  Give

23   it to me, and if the parties believe I should read it every day,

24   I'm happy to do it.

25             MR. FICA:  Very good.

1           THE COURT:  Let's just talk about that at a convenient

2     time tomorrow.

3           MR. FICA:  Thank you, Your Honor.

4           THE COURT:  All right.  We'll be in recess.

5        (Court recessed at 5:05 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4

5

6              I, Tamara Hohenleitner, Federal Official Realtime

7       Court Reporter, in and for the United States District Court for

8       the District of Idaho, do hereby certify that pursuant to

9       Section 753, Title 28, United States Code, that the foregoing

10      is a true and correct transcript of the stenographically

11      reported proceedings held in the above-entitled matter and that

12      the transcript page format is in conformance with the

13      regulations of the Judicial Conference of the United States.

14

15                            Dated this 7th day of December, 2015.

16

17

18                            /S/ TAMARA I. HOHENLEITNER
                              _____
19                            TAMARA I. HOHENLEITNER, CSR NO. 619, CRR
                              FEDERAL OFFICIAL COURT REPORTER
20

21

22

23

24

25

## 1

**1** [1] - 9:7
**10** [6] - 21:11, 25:1, 25:2, 27:6, 27:8
**11** [1] - 8:10
**11:09** [1] - 19:15
**11:30** [1] - 19:4
**11:33** [1] - 19:15
**129** [1] - 15:2
**12:00** [1] - 46:14
**12:10** [1] - 46:14
**132** [2] - 21:11, 21:12
**14** [2] - 20:4, 32:10
**140** [1] - 32:25
**14th** [1] - 4:2
**15** [3] - 20:6, 25:2
**15-minute** [1] - 19:21
**17** [1] - 37:3
**1:06** [1] - 19:17

## 2

**2** [3] - 3:2, 9:8, 32:13
**20** [3] - 12:13, 12:16, 32:16
**2005** [2] - 30:19, 33:11
**2010** [2] - 38:18, 38:19
**2015** [1] - 3:2
**24** [4] - 7:17, 8:3, 27:2, 27:5
**24(a)(3** [1] - 8:3
**24(a)(4** [1] - 8:4
**24(b)(3** [1] - 8:18
**2:22** [1] - 19:17
**2:30** [1] - 46:19

## 3

**3** [3] - 4:22, 4:24, 5:4
**30** [1] - 21:11
**31** [3] - 47:4, 47:6, 47:12
**34** [1] - 21:13

## 4

**4** [4] - 4:24, 5:4, 21:9, 21:10
**40** [4] - 11:14, 11:15, 28:8, 40:13
**4:08** [1] - 25:4
**4:25** [1] - 25:4

## 5

**5** [3] - 5:1, 5:2, 5:4
**5:00** [2] - 46:16
**5:05** [1] - 49:5
**5:20** [1] - 46:21

## 6

**6** [2] - 5:2, 5:4

## 7

**7** [1] - 8:10
**70** [1] - 33:2
**73** [1] - 38:16
**73-year-old** [2] - 40:20, 42:1
**7:30** [1] - 35:12

## 8

**88** [4] - 27:25, 28:2, 28:5, 28:10

## 9

**9:00** [3] - 46:11, 46:12, 46:25
**9:01** [1] - 12:11
**9:07** [1] - 12:11

## A

**a.m** [6] - 12:11, 19:15, 46:11, 46:25
**abandoned** [2] - 29:16, 29:23
**ability** [3] - 13:21, 21:16, 38:11
**able** [4] - 25:16, 25:21, 26:9, 26:11
**absent** [4] - 3:3, 20:18, 25:5, 47:2
**absolute** [2] - 6:15, 7:9
**absolutely** [2] - 18:25, 39:1
**accept** [1] - 44:25
**accommodate** [1] - 18:23
**accomplish** [2] - 11:20, 19:10
**accomplished** [1] - 17:6
**accurate** [1] - 36:23
**accusers** [1] - 42:21
**accusing** [1] - 17:24
**acid** [1] - 32:13
**acidic** [2] - 32:15, 32:17
**Adam** [2] - 3:10, 16:8
**add** [2] - 47:5, 47:13
**added** [1] - 4:8
**addictions** [1] - 37:11
**addition** [1] - 30:6
**additional** [4] - 8:5,
8:6, 8:11, 43:11
**address** [2] - 15:23, 26:11
**addressed** [3] - 14:8, 14:19, 18:14
**adequate** [1] - 47:12
**adjust** [1] - 46:19
**admissible** [1] - 24:5
**admit** [1] - 31:4
**admitted** [2] - 21:1, 21:2
**ads** [1] - 41:24
**adversely** [1] - 45:18
**advisory** [1] - 3:19
**affect** [1] - 25:25
**affecting** [2] - 14:18, 37:15
**afternoon** [3] - 29:10, 46:15, 46:23
**Agent** [2] - 3:16, 37:4
**agents** [1] - 39:23
**ago** [1] - 17:5
**agree** [4] - 22:16, 24:14, 43:5, 47:14
**ahead** [1] - 25:13
**aid** [2] - 18:20, 18:21
**aids** [25] - 13:3, 13:12, 13:17, 14:2, 14:3, 14:8, 14:15, 15:13, 15:15, 15:19, 16:2, 16:6, 16:7, 16:9, 16:13, 16:17, 16:18, 17:25, 18:4, 18:8, 18:14, 18:15, 18:17, 18:22
**allow** [3] - 7:18, 24:18, 28:14
**allowed** [3] - 27:5, 44:8, 44:15
**alluded** [1] - 29:5
**alternate** [11] - 8:2, 8:6, 8:7, 8:17, 8:19, 8:21, 8:22, 9:7, 9:8, 9:9
**alternates** [2] - 8:9, 8:12
**America** [1] - 3:7
**amount** [1] - 11:18
**amplify** [1] - 44:5
**anchor** [1] - 35:3
**anew** [2] - 8:24, 9:11
**annoy** [1] - 35:8
**annoys** [1] - 35:7
**anticipate** [2] - 33:23, 38:13
**anyway** [4] - 4:11, 27:10
**AO** [1] - 48:18
**apologize** [1] - 18:5
**appearances** [1] - 3:9
**applies** [1] - 29:1
**apply** [2] - 38:9, 44:6
**appropriate** [2] - 26:3, 35:21
**approval** [1] - 15:17
**approved** [1] - 15:6
**area** [1] - 35:17
**arguing** [1] - 42:7
**argumentative** [1] - 42:3
**arrangement** [1] - 19:8
**arrest** [1] - 18:18
**arrested** [1] - 16:15
**arrival** [1] - 31:16
**assess** [1] - 34:2
**assist** [2] - 28:23, 47:10
**associated** [1] - 39:22
**assume** [1] - 23:3
**attention** [2] - 27:21, 41:16
**attentive** [1] - 28:20
**attorney** [3] - 15:7, 37:2, 37:6
**attorneys** [3] - 7:19, 7:22, 10:10
**audience** [1] - 6:11
**authenticity** [1] - 21:3
**authorized** [1] - 27:1
**available** [3] - 11:1, 40:7, 45:10
**avoid** [2] - 9:2, 46:3
**aware** [1] - 45:5

## B

**bad** [2] - 23:20, 30:9, 30:12
**bags** [1] - 46:22
**banners** [1] - 41:23
**Bannock** [1] - 17:10
**base** [1] - 43:20
**based** [3] - 38:14, 45:9, 45:16
**basic** [1] - 32:7
**basis** [3] - 16:2, 21:4, 27:4
**beakers** [1] - 40:17
**bear** [1] - 34:4
**bearing** [1] - 29:18
**bears** [1] - 34:6
**become** [1] - 45:5
**becomes** [1] - 9:4
**begin** [3] - 8:24, 9:11, 11:23
**beginning** [2] - 5:20, 38:2
**begun** [2] - 8:23, 9:10
**behalf** [2] - 3:11, 3:13
**beings** [1] - 44:2
**bell** [1] - 22:5
**belong** [1] - 4:24
**below** [1] - 8:6
**bend** [1] - 11:8
**benefit** [1] - 35:15
**best** [4] - 7:24, 18:2, 28:9, 40:21
**better** [2] - 7:25, 42:10
**between** [1] - 43:25
**beyond** [4] - 5:1, 27:6, 27:16, 41:20
**Bingham** [17] - 13:15, 14:9, 14:12, 16:18, 16:20, 16:23, 17:7, 17:8, 17:10, 17:11, 17:13, 17:17, 17:20, 17:23, 18:4, 18:10, 19:1
**bit** [1] - 10:3, 37:13
**BlackBerry** [1] - 44:20
**blanks** [1] - 41:21
**blog** [1] - 44:22
**blogs** [1] - 44:15
**Bonneville** [1] - 16:14
**books** [1] - 44:11
**bore** [1] - 31:22
**bought** [2] - 30:8, 30:11
**box** [2] - 5:12, 43:6
**break** [7] - 12:13, 12:23, 19:14, 19:21, 28:8, 46:13
**breaks** [4] - 24:25, 28:7, 28:9, 28:13
**bright** [2] - 39:7, 46:23
**bring** [5] - 6:17, 9:20, 18:24, 27:10, 37:18
**bringing** [1] - 18:17
**brings** [1] - 23:20
**broke** [1] - 18:20
**brother** [1] - 40:7
**brought** [5] - 12:5, 14:3, 30:9, 30:12, 41:21
**bubbling** [1] - 40:18
**building** [1] - 37:17
**Bunsen** [1] - 40:18
**burden** [2] - 34:5, 34:6
**burners** [1] - 40:18
**business** [6] - 29:12, 30:4, 38:21, 38:23, 38:24, 39:2, 39:11, 40:8, 40:12, 43:5
**buy** [2] - 18:22, 40:2
**buys** [1] - 23:18

# C

candidates [1] - 41:22
cannot [2] - 13:22,
45:1
care [1] - 15:23
career [1] - 37:3
carefully [4] - 5:13,
36:19, 43:3, 43:8
caring [1] - 38:21
case [27] - 4:24, 8:21,
9:2, 12:15, 28:19,
34:13, 36:11, 37:5,
41:7, 43:16, 43:17,
44:2, 44:14, 44:16,
44:18, 44:24, 44:25,
45:3, 45:8, 45:9,
45:12, 45:18, 45:22,
46:4, 48:6
cases [2] - 36:24,
43:14
Cassia [1] - 35:20
casual [1] - 35:8
categories [1] - 32:7
caught [1] - 14:17
caused [1] - 31:18
cautionary [1] - 48:2
cautioned [1] - 48:1
ceiling [1] - 37:19
cellphone [1] - 44:20
certain [5] - 25:24,
35:2, 39:14, 42:22
certainly [4] - 25:20,
26:5, 43:6, 48:12
cetera [1] - 15:3
challenge [2] - 8:11,
21:3
challenges [6] - 5:15,
8:5, 8:6, 27:1, 27:6,
27:8
chambers [2] - 9:20,
12:17
chance [2] - 24:15,
42:17
change [1] - 16:19
changed [1] - 47:21
changing [2] - 36:12,
48:17
characteristics [1] -
10:5
charge [6] - 4:12,
23:22, 27:22, 38:3,
41:20, 47:21
charged [2] - 41:15,
41:17
chat [1] - 44:22
check [2] - 4:9, 46:22
checked [1] - 18:8
chemicals [3] - 31:8,
39:14, 39:15

chemists [4] - 32:4,
32:8, 32:14, 33:1
choose [2] - 12:2,
22:13
chooses [1] - 42:16
chose [2] - 29:13,
34:12
Circuit [1] - 48:2
civic [1] - 35:23
claim [1] - 34:2
clarify [1] - 6:17
clean [4] - 23:22, 33:6,
39:8, 39:11
cleanup [2] - 30:17,
30:19
clear [10] - 4:8, 5:11,
5:22, 7:8, 8:3, 20:20,
21:20, 34:4, 35:20,
46:10
clerk [1] - 46:19
CLERK [1] - 20:3
client [4] - 15:8, 23:1,
23:2, 25:25
client's [1] - 26:3
close [3] - 11:11,
41:16, 48:7
closer [5] - 10:7, 10:8,
10:12, 33:2
clothing [1] - 37:22
coats [1] - 40:17
coherent [1] - 42:18
colleagues [1] - 43:18
colloquy [1] - 23:13
Colorado [2] - 43:13,
43:14
combines [1] - 42:24
comfortable [1] -
26:16
coming [4] - 18:15,
23:5, 27:15, 46:22
commenced [1] -
12:12
comments [4] - 4:14,
13:25, 14:1, 47:19
communicate [7] -
13:22, 14:15, 14:16,
44:17, 44:24, 45:2,
45:8
communications [1] -
46:4
company [1] - 40:4
compare [1] - 48:10
complained [1] - 31:7
complaint [1] - 26:17
complaints [1] - 18:11
complications [1] -
38:17
computer [1] - 44:21
concern [2] - 22:6,
25:23

concerned [1] - 26:6
concrete [5] - 29:12,
38:23, 39:6, 39:14,
39:23
condition [3] - 33:15,
33:18, 40:24
conduct [1] - 44:25
conference [4] - 4:2,
4:12, 8:15, 47:22
configure [1] - 10:3
confirm [1] - 31:20
confusion [1] - 34:10
connection [1] - 44:12
consequences [1] -
45:25
consider [5] - 5:3,
40:25
consistent [1] - 34:14
constitutional [1] -
4:25
consult [1] - 44:9
contacted [1] - 18:9
containers [3] - 29:14,
31:10, 31:22
context [1] - 22:3
continue [2] - 9:2, 9:4
continued [2] - 19:16,
19:18
contractor [1] - 23:21
contractors [1] -
23:17
convenient [1] - 49:1
conversations [2] -
43:25, 44:1
convincing [1] - 34:4
Cook [2] - 16:14,
16:15
correct [1] - 20:2
correspond [1] - 45:2
corroding [1] - 29:21
corrosive [5] - 29:18,
31:23, 32:8, 32:11
counsel [9] - 3:9,
3:14, 5:25, 6:1, 7:3,
10:8, 10:18, 10:22,
12:24
count [1] - 34:15
counter [1] - 38:24
county [1] - 35:14
County [19] - 13:15,
14:9, 14:12, 16:18,
16:20, 16:23, 17:8,
17:10, 17:11, 17:13,
17:17, 17:20, 17:23,
18:4, 18:10, 30:18,
31:14
couple [5] - 7:18, 8:3,
17:9, 19:11, 23:23
course [1] - 29:4
Court [1] - 49:5

court [25] - 5:24, 6:25,
7:1, 7:4, 8:19, 8:20,
8:23, 10:1, 10:3,
13:20, 19:11, 20:8,
20:20, 21:4, 24:24,
26:1, 26:8, 26:14,
26:17, 27:5, 28:20,
43:22, 43:23, 48:6,
48:8
Courtney [1] - 31:13
courtroom [10] - 5:12,
5:24, 12:6, 37:6,
43:19, 44:8, 45:10,
45:16, 45:24, 46:6
created [2] - 43:16,
43:17
credibility [1] - 24:6
crime [4] - 22:22,
22:24, 38:6, 41:14
criminal [5] - 4:20,
4:24, 8:15, 22:7,
43:14
criticizing [1] - 26:2
CULLMAN [31] - 3:10,
3:16, 3:20, 6:4, 6:10,
9:14, 9:23, 11:7,
11:15, 12:8, 16:8,
17:25, 20:8, 20:11,
20:14, 20:20, 20:25,
21:2, 21:9, 21:11,
21:13, 21:18, 22:18,
22:20, 23:12, 23:17,
24:1, 24:22, 29:9,
42:2, 47:16
Cullman [6] - 3:10,
4:10, 6:3, 6:4, 6:6,
16:8
custody [7] - 14:6,
16:19, 17:12, 18:16,
18:20, 18:21, 18:22

# D

damaged [1] - 18:20
Darin [1] - 3:16
Darren [2] - 18:2, 18:6
daughter [1] - 40:6
days [4] - 17:9, 36:16,
38:10, 46:24
dealership [1] - 39:10
dealerships [1] - 39:7
decades [1] - 39:2
decay [1] - 31:24
decide [4] - 11:13,
28:18, 45:9, 48:13
decided [2] - 8:8, 22:1
decision [1] - 45:16
decisions [1] - 43:21
deemed [1] - 32:25
defendant [35] - 4:24,

6:14, 6:15, 7:8, 7:9,
7:11, 11:18, 24:4,
24:8, 26:25, 27:6,
29:11, 29:17, 29:22,
30:1, 30:7, 30:14,
30:18, 30:20, 30:22,
30:25, 31:9, 31:12,
31:17, 33:5, 33:12,
33:20, 33:23, 34:3,
34:5, 34:8, 34:10,
34:22, 42:20, 45:22
defendant's [8] -
20:21, 23:12, 31:6,
31:8, 32:6, 32:14,
33:1, 33:7
defense [2] - 34:3,
37:6
degree [1] - 11:25
degrees [2] - 32:25,
33:2
delay [2] - 16:1, 17:2
deliberate [3] - 8:16,
8:20, 44:1
deliberations [8] -
8:23, 8:24, 9:10,
9:11, 44:6, 44:17,
45:4, 45:13
demonstrate [1] -
22:15
demonstrative [1] -
21:22
Denver [1] - 46:20
Department [2] - 16:8,
31:19
describe [7] - 22:3,
22:13, 22:23, 23:7,
24:20, 31:11, 31:16
describing [2] - 24:11,
24:13
description [1] - 44:12
deserves [2] - 42:19,
42:20
designated [4] - 35:14
destroyed [1] - 18:21
Detective [1] - 31:13
developed [1] - 39:5
device [1] - 44:19
diabetes [1] - 38:18
diabetic [1] - 28:5
dictionaries [1] -
44:10
died [1] - 38:17
different [2] - 30:17,
48:13
differently [1] - 10:4
difficult [1] - 26:8
diluting [1] - 32:16
dingy [1] - 39:12
dire [5] - 7:16, 7:21,
12:12, 19:16, 19:18

**direct** [3] - 6:6, 6:8, 7:19
**direction** [1] - 25:24
**disabled** [1] - 9:4
**discharged** [2] - 8:22, 44:3
**discouraged** [1] - 35:6
**discovered** [1] - 45:24
**discuss** [4] - 8:21, 12:18, 45:3, 45:12
**discussed** [1] - 4:2
**discussing** [1] - 9:3
**Discussion** [2] - 27:20, 34:20
**discussions** [2] - 12:15, 33:12
**dispensed** [1] - 7:15
**display** [1] - 37:11
**disposal** [2] - 30:15, 31:8
**dispose** [1] - 29:13
**disposed** [1] - 33:5
**disposing** [1] - 34:15
**distance** [1] - 35:17
**distract** [1] - 28:19
**distracted** [1] - 19:11
**division** [1] - 15:18
**doctor** [3] - 15:14, 16:4, 17:22
**documentation** [3] - 14:23, 15:2, 15:11
**documented** [2] - 15:9, 18:9
**documenting** [1] - 29:15
**dollars** [1] - 41:23
**done** [4] - 14:14, 15:5, 15:8, 15:20
**doubt** [2] - 5:2, 41:20
**down** [3] - 17:10, 35:20, 40:20
**dozens** [2] - 26:15
**drive** [1] - 46:21
**driven** [1] - 39:1
**due** [1] - 31:24
**dumped** [2] - 30:2, 30:13
**during** [8] - 4:16, 22:2, 23:7, 38:19, 44:17, 45:4, 45:13, 47:8
**duty** [4] - 35:23, 36:18, 38:8, 44:6

### E

**early** [2] - 35:17, 46:23
**earmuffs** [2] - 13:4, 13:18
**ears** [1] - 43:10
**easier** [1] - 43:10

**easily** [1] - 36:13
**easy** [1] - 7:20
**eat** [4] - 27:23, 28:4, 28:9, 28:12
**either** [3] - 10:18, 32:11, 35:9
**electronic** [2] - 44:19, 45:7
**electronically** [1] - 45:2
**elements** [1] - 5:8
**elephants** [1] - 37:20
**email** [1] - 15:10
**emitted** [1] - 32:22
**emphasize** [1] - 44:13
**encourage** [1] - 42:6
**end** [6] - 4:12, 8:16, 32:17, 34:13, 42:23, 46:15
**enforcement** [1] - 37:4
**ensure** [2] - 8:20, 13:16
**enter** [1] - 3:9
**Enterprises** [2] - 29:13, 40:8
**entirely** [1] - 42:18
**entitled** [1] - 8:4
**Environmental** [1] - 31:19
**EPA** [3] - 3:17, 23:21, 23:22
**equal** [1] - 32:12
**equally** [1] - 42:21
**essentially** [4] - 22:22, 32:17, 33:16, 47:12
**et** [1] - 15:3
**evening** [1] - 47:1
**everywhere** [1] - 29:22
**Evidence** [1] - 7:17
**evidence** [14] - 4:23, 5:3, 6:16, 11:23, 19:23, 21:15, 21:16, 21:21, 21:23, 22:2, 22:14, 24:6, 24:17, 24:19, 28:17, 28:23, 29:5, 29:6, 30:14, 30:24, 31:3, 34:4, 34:7, 34:14, 38:2, 41:2, 41:18, 44:7, 45:9, 45:14, 47:22, 48:7
**exact** [2] - 30:25, 48:20
**exactly** [2] - 31:17, 32:1
**excuse** [3] - 8:17, 27:2, 27:4
**excused** [1] - 20:1
**exercise** [1] - 5:14

**exhibits** [6] - 20:24, 21:22, 21:23, 22:8, 22:16, 37:20
**expands** [1] - 45:23
**expansive** [1] - 38:4
**expect** [2] - 31:3, 45:5
**expectations** [1] - 36:2
**expects** [1] - 31:3
**expedite** [1] - 16:12
**expedited** [1] - 16:2
**expense** [1] - 38:4
**experienced** [2] - 30:3, 36:1
**experiencing** [1] - 36:1
**explain** [2] - 36:4, 43:12
**explained** [2] - 30:7, 30:21
**explaining** [1] - 36:17
**explore** [1] - 22:3
**expressing** [1] - 35:22
**extensive** [1] - 33:12
**extent** [1] - 47:20
**extremes** [1] - 26:10

### F

**Facebook** [1] - 44:23
**facilities** [1] - 18:16
**facility** [2] - 15:8, 18:17
**fact** [9] - 13:21, 22:23, 27:7, 29:19, 30:17, 31:9, 38:3, 38:19, 43:17
**factual** [1] - 43:21
**faith** [1] - 24:12
**fall** [1] - 32:6
**fallen** [1] - 16:15
**falling** [1] - 32:17
**Falls** [2] - 46:21, 46:22
**family** [1] - 18:24
**far** [3] - 9:25, 13:5, 19:12
**Federal** [1] - 7:17
**federal** [3] - 35:18, 37:3, 37:25
**fellow** [7] - 28:18, 28:25, 45:4, 45:12, 45:17, 46:2, 47:11
**few** [4] - 20:11, 35:12, 38:10, 38:18
**FICA** [10] - 3:11, 26:22, 47:23, 47:25, 48:5, 48:12, 48:16, 48:20, 48:25, 49:3
**Fica** [3] - 3:11, 6:2, 10:9, 10:13

**figure** [2] - 18:13, 31:25
**file** [1] - 16:10
**fill** [1] - 41:21
**final** [3] - 8:14, 44:5, 47:20
**finally** [2] - 5:4, 33:4
**fine** [5] - 11:4, 11:7, 11:10, 28:11, 28:12
**finish** [2] - 7:21, 46:16
**finished** [2] - 30:24, 42:5
**finishing** [1] - 38:24
**first** [9] - 4:22, 9:8, 15:6, 19:24, 23:18, 31:14, 31:25, 33:5, 37:5
**five** [1] - 38:19
**flammable** [2] - 29:18, 31:22
**flash** [1] - 32:20, 32:24, 33:2
**floor** [2] - 39:8, 39:13
**floors** [1] - 39:6
**focus** [1] - 41:2
**folks** [7] - 9:3, 17:20, 35:13, 35:16, 38:11, 40:16, 43:5
**follow** [8] - 5:19, 7:23, 13:12, 13:14, 24:5, 26:7, 27:3, 46:7
**follow-up** [3] - 5:19, 7:23, 27:3
**follows** [2] - 8:18, 24:4, 47:6, 47:7
**foreclose** [1] - 24:7
**form** [3] - 4:1, 4:7, 4:8
**formal** [2] - 4:11, 27:22
**forth** [3] - 10:11, 41:3, 42:13
**fortunately** [1] - 3:5
**foundation** [3] - 21:16, 22:3, 22:17
**four** [2] - 27:22, 39:2
**frame** [1] - 46:14
**free** [2] - 20:1, 23:22
**frequently** [1] - 30:20
**Friday** [2] - 46:18, 46:19
**front** [6] - 4:14, 5:10, 10:23, 11:3, 11:8, 41:22
**fulfilled** [1] - 39:19
**full** [2] - 22:2, 46:24
**Fulwyler** [3] - 3:24, 5:21, 20:2
**function** [1] - 11:24
**furnishings** [1] - 37:20

**furthermore** [1] - 30:14

### G

**garage** [1] - 39:12
**garages** [1] - 39:7
**general** [1] - 10:4
**given** [2] - 15:3, 20:5
**gladly** [1] - 18:23
**goal** [2] - 11:19, 46:15
**Google** [1] - 44:14
**government** [17] - 3:15, 4:3, 5:25, 6:7, 9:23, 11:15, 12:8, 23:8, 26:20, 27:3, 29:7, 31:3, 34:4, 34:13, 37:17, 37:25, 42:21
**government's** [1] - 22:14
**gratitude** [1] - 35:22
**gray** [2] - 39:8, 39:17
**great** [1] - 28:13
**ground** [1] - 29:24
**guess** [3] - 16:12, 20:9, 42:15
**guessing** [1] - 43:2
**guilty** [2] - 33:25, 34:15
**guys** [1] - 35:18

### H

**half** [1] - 37:18
**handle** [1] - 33:13
**hands** [1] - 37:18
**handwritten** [1] - 19:8
**happy** [5] - 46:2, 48:8, 48:21, 48:24
**hard** [1] - 40:14
**hate** [1] - 26:2
**hazardous** [16] - 29:14, 29:16, 29:18, 30:15, 30:23, 31:8, 31:21, 32:6, 32:13, 32:25, 33:6, 33:13, 34:8, 34:11, 34:16, 38:25
**hazmat** [1] - 31:19
**headquarters** [1] - 18:19
**health** [1] - 42:1
**hear** [26] - 13:3, 13:5, 13:19, 13:22, 19:6, 29:4, 30:4, 30:6, 30:19, 31:5, 31:13, 31:20, 32:1, 32:3, 32:11, 32:19, 32:21, 32:23, 32:25, 33:4,

33:10, 33:19, 36:24, 40:9, 43:23

**heard** [15] - 5:16, 19:12, 19:13, 22:18, 38:15, 38:25, 41:11, 42:9, 42:14, 42:17, 42:20, 42:21, 44:8, 45:13, 47:22

**hearing** [33] - 13:3, 13:12, 13:17, 14:2, 14:3, 14:8, 14:15, 15:13, 15:14, 15:15, 15:19, 16:2, 16:4, 16:5, 16:6, 16:9, 16:13, 16:17, 16:18, 17:22, 17:25, 18:4, 18:7, 18:11, 18:14, 18:15, 18:17, 18:20, 18:21, 18:22, 36:15, 38:10

**hearsay** [1] - 24:8
**heartburn** [1] - 18:16
**help** [3] - 28:16, 39:16, 39:23
**Heyrend** [1] - 31:5
**high** [2] - 32:11, 37:19
**highly** [2] - 21:25, 22:4
**himself** [1] - 6:13
**historically** [1] - 16:9
**history** [2] - 18:7, 45:22
**hold** [4] - 13:7, 23:14, 34:18, 38:21
**home** [1] - 10:3
**honestly** [1] - 16:10
**hour** [1] - 28:8
**hours** [3] - 27:23, 28:4, 28:10
**house** [1] - 39:4
**human** [1] - 44:2

## I

**Idaho** [5] - 31:19, 37:17, 43:13, 46:20, 46:21
**idea** [2] - 13:24, 37:9
**ideas** [1] - 35:25
**identify** [1] - 21:6
**ignitable** [4] - 32:7, 32:19, 33:1
**ignite** [2] - 32:22, 32:23
**ignore** [1] - 34:12
**imagining** [1] - 40:17
**immense** [1] - 35:19
**impact** [2] - 37:22, 45:18
**impaneled** [1] - 8:12

**impeach** [1] - 26:8
**impedes** [1] - 13:21
**important** [9] - 4:20, 5:7, 12:16, 26:18, 35:9, 41:16, 42:13, 45:8, 45:14
**importantly** [1] - 40:23
**impossible** [1] - 22:5
**impractical** [1] - 16:25
**impression** [2] - 39:9
**impressive** [2] - 38:5, 41:3
**improper** [2] - 41:8, 41:17
**inaccurate** [1] - 45:11
**inappropriate** [2] - 11:12, 14:16
**inappropriately** [1] - 43:15
**Inaudible** [1] - 23:13
**incident** [1] - 33:11
**includes** [1] - 44:14
**including** [1] - 44:9
**incomplete** [1] - 45:11
**incorporated** [1] - 4:3
**incredible** [1] - 37:25
**indeed** [1] - 31:21
**indicate** [2] - 24:3, 36:21
**indictment** [2] - 4:23, 5:10
**individual** [1] - 42:1
**infirm** [1] - 9:4
**influence** [4] - 26:6, 37:24, 38:2, 43:4
**influenced** [3] - 28:24, 45:15, 47:11
**influences** [2] - 37:15, 42:12
**inform** [1] - 45:5
**information** [9] - 9:2, 43:3, 43:16, 44:13, 44:18, 44:24, 45:10, 45:16, 46:5
**initial** [1] - 5:17
**initiated** [3] - 13:16, 17:11, 17:13
**input** [1] - 4:13
**insane** [2] - 33:24, 34:5
**insanity** [1] - 34:2
**inside** [1] - 18:17
**insincere** [1] - 35:11
**insist** [1] - 21:20
**inspectors** [2] - 30:20, 33:10
**instance** [2] - 15:13, 32:12
**instant** [1] - 44:22

**instruct** [3] - 8:24, 9:10, 34:1
**instructed** [2] - 35:1, 43:18
**instruction** [17] - 4:17, 5:1, 5:9, 28:15, 29:1, 43:12, 44:4, 46:10, 47:3, 47:13, 47:20, 48:3, 48:7, 48:8, 48:18, 48:20
**Instruction** [3] - 5:2, 47:4, 47:6
**instructions** [11] - 3:25, 4:7, 4:14, 4:19, 5:5, 5:13, 5:17, 29:4, 29:5, 44:7, 45:6
**insulated** [1] - 9:1
**intake** [1] - 18:8
**intend** [1] - 36:5
**intent** [2] - 22:14, 43:1
**interactions** [2] - 31:11, 31:17
**interests** [1] - 26:3
**Internet** [10] - 43:15, 43:22, 44:11, 44:14, 44:21, 44:22, 45:10, 46:9, 48:3
**intervening** [1] - 40:4
**introduce** [6] - 5:22, 5:23, 6:1, 6:2, 6:13, 22:14
**introduction** [1] - 37:1
**introductions** [1] - 5:17
**investigate** [1] - 45:7
**investigation** [1] - 46:3
**invite** [1] - 7:24
**iPhone** [1] - 44:20
**irritating** [1] - 10:11
**Island** [1] - 35:19
**issue** [16] - 12:18, 12:19, 12:20, 12:21, 13:1, 13:18, 14:8, 14:19, 17:4, 20:12, 20:19, 22:1, 24:6, 25:8, 25:19, 26:4
**issues** [6] - 5:18, 11:24, 13:6, 18:11, 26:11, 42:1

## J

**jail** [4] - 13:14, 14:3, 15:12, 18:24
**Jail** [4] - 13:15, 16:19, 16:23, 18:10
**Jaynes** [2] - 27:25, 28:1
**Jefferson** [1] - 30:18

**job** [3] - 40:1, 40:3
**Jones** [1] - 27:23
**Judge** [2] - 4:18, 47:23
**judge** [5] - 5:23, 32:24, 34:1, 35:7, 35:8
**judge's** [1] - 35:15
**judicial** [2] - 45:14, 45:18
**July** [1] - 38:19
**June** [1] - 3:2
**juror** [8] - 8:22, 8:23, 9:8, 25:15, 25:22, 26:25, 36:18, 38:8
**juror's** [1] - 45:6
**jurors** [36] - 3:3, 5:12, 5:14, 6:9, 6:20, 7:14, 7:24, 8:2, 8:6, 8:7, 8:17, 8:19, 9:1, 9:4, 9:21, 11:25, 12:5, 12:7, 12:12, 14:18, 19:16, 19:18, 20:1, 20:16, 28:14, 28:18, 28:25, 43:15, 43:18, 43:21, 45:4, 45:12, 45:17, 46:2, 46:6, 47:11
**Jury** [5] - 19:19, 20:18, 25:5, 27:12, 47:2
**jury** [42] - 3:23, 3:25, 4:7, 4:16, 4:19, 5:17, 6:17, 8:16, 8:19, 8:24, 9:10, 9:22, 9:24, 10:7, 10:12, 11:12, 11:20, 11:22, 11:23, 12:19, 14:2, 20:5, 20:13, 20:17, 22:1, 22:8, 23:9, 25:9, 25:11, 26:13, 27:10, 28:18, 28:21, 35:10, 35:18, 36:2, 41:18, 43:6, 44:12, 45:4, 48:1
**jury's** [1] - 26:9
**Justice** [1] - 16:8

## K

**keep** [5] - 9:1, 28:17, 33:14, 33:18, 33:21
**kept** [1] - 30:12
**kind** [10] - 13:5, 14:7, 26:6, 36:8, 39:5, 39:9, 40:19, 40:22, 44:9, 44:16
**knowledge** [3] - 14:11, 33:8, 43:19
**known** [2] - 29:12, 45:17

**knows** [3] - 39:11, 40:15, 43:1

## L

**lab** [1] - 40:17
**labels** [2] - 29:18, 31:22
**laboratory** [3] - 32:4, 32:5, 41:4
**lacquer** [1] - 39:22
**ladder** [1] - 37:18
**LAMBERT** [1] - 18:5
**Lambert** [1] - 18:6
**large** [1] - 39:18
**last** [3] - 13:11, 13:13, 13:16, 14:6, 14:14, 14:19, 17:20
**late** [1] - 46:23
**law** [8] - 30:15, 30:21, 34:11, 37:3, 44:7, 44:11, 46:19, 48:6
**lawful** [1] - 22:16
**lay** [1] - 21:16
**leaking** [1] - 29:21, 33:16
**lean** [1] - 13:20
**leaning** [1] - 25:24
**learn** [1] - 46:5
**learning** [1] - 18:18
**least** [5] - 11:21, 17:4, 25:1, 25:22, 43:12
**leave** [4] - 20:16, 28:20, 46:21
**leaves** [2] - 25:22, 46:20
**lectern** [6] - 10:6, 10:15, 10:18, 10:24, 11:4, 11:11
**left** [8] - 14:12, 28:21, 29:16, 30:2, 31:9, 31:10, 31:24, 48:1
**legal** [1] - 23:4
**length** [1] - 11:13
**lengths** [1] - 37:25
**less** [2] - 32:12, 32:24
**letters** [1] - 35:15
**license** [1] - 35:13
**lieu** [1] - 4:11
**light** [1] - 36:13
**likely** [1] - 6:7
**limit** [1] - 43:19
**line** [2] - 27:14, 27:15
**LinkedIn** [1] - 44:23
**lips** [2] - 13:5, 13:23
**list** [3] - 6:7, 6:25, 7:13
**listen** [7] - 5:13, 13:7, 41:1, 41:18, 42:11, 43:8
**literally** [2] - 17:17,

25:17
**lived** [1] - 31:5
**living** [1] - 40:21
**location** [2] - 16:19, 33:19
**locker** [1] - 33:20
**logos** [1] - 40:5
**look** [6] - 3:5, 4:4, 33:16, 41:12, 44:8, 47:17
**looked** [2] - 22:24, 41:9
**looking** [2] - 22:11, 40:10
**lost** [1] - 16:10
**loud** [1] - 13:24
**louder** [1] - 36:20
**loved** [1] - 37:8
**low** [1] - 32:11
**lunch** [1] - 46:14

## M

**Madison** [1] - 31:14
**magnifies** [1] - 13:19
**man** [2] - 39:24, 40:5
**mand** [1] - 47:4
**manner** [1] - 26:2
**Marcus** [2] - 20:17, 34:18
**MARSHAL** [8] - 14:21, 14:23, 15:1, 16:3, 16:13, 17:15, 17:17, 18:5
**marshal** [3] - 13:7, 13:13, 15:21
**marshals** [5] - 13:2, 14:6, 16:20, 16:21, 17:13
**Marshals** [3] - 13:8, 15:1, 18:6
**material** [7] - 23:19, 30:7, 30:8, 30:10, 34:10, 44:9, 44:11
**materials** [8] - 30:3, 30:4, 31:10, 31:25, 33:14, 33:17, 33:18, 33:21
**matter** [3] - 38:6, 45:20, 47:25
**matters** [2] - 3:22, 12:4
**Max** [12] - 3:8, 18:15, 29:11, 38:13, 38:16, 40:11, 40:12, 40:15, 42:16, 42:24
**Max's** [3] - 36:4, 38:20, 42:15
**maximum** [1] - 47:20
**mean** [8] - 21:21,

21:25, 26:10, 26:16, 39:1, 40:16, 40:24, 41:6
**means** [5] - 8:25, 44:18, 45:7, 45:20
**meant** [1] - 37:22
**meantime** [1] - 19:5
**measured** [2] - 32:9, 32:20
**media** [3] - 44:19, 45:11, 48:3
**medical** [8] - 14:7, 14:8, 15:2, 15:5, 15:12, 15:16, 15:17, 44:10
**medicines** [1] - 15:3
**meet** [2] - 12:17, 20:8
**members** [1] - 5:24
**memory** [4] - 28:23, 28:24, 47:9, 47:10
**Menan** [3] - 30:18, 30:25, 33:22
**mental** [1] - 42:1
**mention** [2] - 8:14, 38:1
**mentioned** [2] - 17:1, 33:4
**mess** [1] - 41:9
**messaging** [1] - 44:22
**met** [1] - 36:2
**microphone** [5] - 10:15, 10:25, 11:4, 14:1, 14:17
**microphones** [2] - 11:8, 13:3
**midmorning** [1] - 46:13
**might** [1] - 45:11
**Mike** [2] - 3:11, 31:13
**million** [1] - 41:23
**mind** [1] - 47:25
**minds** [1] - 39:1
**Mini** [1] - 35:20
**Mini-Cassia** [1] - 35:20
**minute** [1] - 12:17
**minutes** [9] - 11:14, 12:14, 12:16, 20:6, 20:11, 25:1, 25:2, 25:3, 28:8
**mistake** [1] - 34:9
**mistrial** [2] - 43:17, 46:1
**mobile** [1] - 10:19
**moment** [2] - 35:10, 43:8
**Monday** [1] - 46:23
**money** [3] - 38:1, 39:4, 39:25
**month** [1] - 17:2

**months** [3] - 16:6, 17:6, 38:18
**morning** [13] - 3:4, 18:7, 18:9, 18:10, 18:12, 18:19, 19:1, 19:24, 35:12, 46:24, 46:25, 47:4
**most** [5] - 5:7, 33:1, 36:16, 37:16, 40:23
**motion** [2] - 25:17, 27:2
**move** [1] - 10:15
**MR** [73] - 3:10, 3:11, 3:13, 3:16, 3:20, 6:4, 6:10, 6:25, 7:6, 9:14, 9:15, 9:17, 9:23, 9:24, 10:17, 10:21, 10:25, 11:7, 11:15, 12:8, 12:9, 12:17, 12:21, 13:2, 13:11, 15:21, 16:8, 16:17, 17:4, 17:19, 17:25, 18:2, 19:2, 19:10, 20:8, 20:11, 20:14, 20:20, 20:25, 21:2, 21:9, 21:11, 21:13, 21:18, 21:25, 22:18, 22:20, 23:12, 23:17, 24:1, 24:11, 24:22, 25:8, 25:11, 25:14, 26:22, 29:9, 34:24, 35:1, 35:5, 35:7, 42:2, 42:9, 47:15, 47:16, 47:23, 47:25, 48:5, 48:12, 48:16, 48:20, 48:25, 49:3
**MS** [2] - 29:13, 40:8
**muck** [1] - 39:13
**muffs** [1] - 13:4
**Mugleston** [2] - 3:16, 37:4
**multiple** [1] - 41:10
**must** [7] - 8:20, 8:23, 16:15, 34:3, 44:13, 44:17, 46:5
**MySpace** [1] - 44:23

## N

**name** [4] - 13:13, 18:5, 27:24, 37:1
**names** [1] - 6:19
**NEAL** [32] - 3:13, 6:25, 7:6, 9:15, 9:17, 9:24, 10:17, 10:21, 10:25, 12:9, 12:17, 12:21, 13:2, 13:11, 15:21, 16:17, 17:4, 17:19, 18:2, 19:2, 19:10, 21:25, 24:11, 25:8,

25:11, 25:14, 34:24, 35:1, 35:5, 35:7, 42:9, 47:15
**Neal** [16] - 3:13, 6:13, 6:17, 7:12, 9:16, 10:24, 16:24, 19:7, 21:8, 22:15, 24:10, 34:18, 34:22, 37:2, 42:6, 48:22
**near** [1] - 4:12
**nearly** [1] - 41:25
**necessarily** [1] - 36:21
**need** [5] - 5:13, 8:10, 9:1, 10:14, 15:15, 15:21, 23:7, 24:3, 24:19, 24:24, 24:25, 28:3, 46:8, 46:16, 46:21, 47:13
**needed** [7] - 13:12, 13:17, 15:23, 30:23, 33:12, 40:22, 47:5
**needs** [3] - 15:15, 17:21, 27:23
**negative** [1] - 45:25
**neighbors** [1] - 41:9
**never** [1] - 26:11
**newer** [1] - 13:13
**next** [11] - 4:5, 27:14, 31:5, 36:16, 38:10, 40:3, 41:14, 41:25, 46:24, 47:21
**niche** [1] - 39:5
**Ninth** [1] - 48:2
**NO** [4] - 27:25, 28:2, 28:5, 28:10
**nobody** [1] - 17:24
**none** [3] - 15:11, 18:16, 38:2
**nonsense** [1] - 37:10
**normal** [1] - 41:4
**normally** [2] - 5:20, 35:10
**note** [6] - 3:21, 6:12, 28:15, 28:19, 29:1, 34:2
**note-taking** [3] - 28:15, 28:19, 29:1
**noted** [1] - 8:18
**notepads** [1] - 20:5
**notes** [14] - 19:8, 28:14, 28:16, 28:17, 28:21, 28:22, 28:23, 28:24, 47:5, 47:8, 47:9, 47:10, 47:11
**nothing** [8] - 9:23, 9:24, 12:8, 13:20, 14:14, 18:9, 26:5, 27:7
**nuisance** [2] - 31:15, 41:7

**number** [3] - 8:5, 21:7, 31:6
**numbers** [2] - 8:9, 35:16

## O

**objected** [2] - 21:5, 24:15
**objection** [15] - 9:12, 11:5, 21:8, 21:17, 21:19, 23:4, 24:9, 24:10, 24:12, 26:13, 26:18, 42:2, 42:6, 42:8, 48:22
**objections** [1] - 4:6
**objects** [3] - 22:15, 23:7, 23:9
**obviously** [16] - 6:8, 6:15, 8:12, 8:25, 10:4, 10:6, 11:17, 15:25, 16:25, 21:2, 21:15, 22:13, 23:8, 24:5, 26:24, 35:16
**occasions** [1] - 31:7
**occur** [1] - 45:25
**occurred** [2] - 30:19, 38:19
**odors** [1] - 37:8
**offense** [1] - 33:24
**Office** [2] - 16:14, 31:14
**Officer** [1] - 16:15
**often** [1] - 36:5
**old** [2] - 38:16, 41:25
**on-site** [1] - 31:24
**once** [1] - 34:7
**one** [29] - 4:1, 4:9, 4:22, 8:11, 9:3, 9:5, 11:8, 16:19, 18:3, 19:8, 23:4, 25:8, 25:15, 27:22, 28:21, 30:2, 37:5, 37:16, 41:10, 41:23, 41:25, 42:9, 43:11, 43:17, 43:24, 46:13, 47:25
**ones** [1] - 5:7
**opening** [22] - 5:21, 9:25, 11:13, 11:21, 11:22, 19:22, 20:6, 20:22, 22:9, 22:10, 23:7, 24:3, 24:13, 25:6, 27:11, 29:2, 29:3, 29:7, 34:22, 34:23, 42:7
**operation** [1] - 15:18
**operator** [1] - 29:12
**opportunity** [2] - 22:3, 42:16
**opposed** [2] - 10:21,

39:12
**options** [1] - 4:9
**order** [8] - 9:7, 12:14, 19:4, 21:20, 27:15, 27:18, 35:2, 35:4
**ordered** [2] - 43:25, 46:9
**ordering** [1] - 45:21
**orders** [1] - 21:4
**ornate** - 37:16
**otherwise** [1] - 45:16
**outbuildings** [1] - 29:24
**outside** [4] - 18:23, 31:24, 43:23, 45:15
**overgrown** [1] - 29:20
**overheard** [2] - 14:2, 14:17
**overly** [2] - 28:24, 47:11
**overrule** [2] - 42:5, 42:8
**overruled** [1] - 24:15
**own** [1] - 43:1
**owned** [1] - 30:18

**P**

**p.m** [5] - 19:17, 25:4, 49:5
**pace** [3] - 10:10, 10:11, 35:2
**paint** [8] - 39:3, 39:6, 39:17, 39:21, 42:22
**painted** [1] - 39:2
**painting** [2] - 39:2, 39:6
**parallel** [1] - 10:8
**Park** [1] - 35:19
**part** [3] - 5:9, 36:17, 40:2
**particular** [1] - 7:23
**parties** [2] - 22:7, 45:17, 48:23
**party** [4] - 6:18, 7:11, 24:9, 43:16
**passed** [1] - 21:3
**past** [2] - 16:11, 46:16
**pay** [2] - 39:3, 41:16
**people** [8] - 6:9, 37:21, 38:7, 38:9, 39:3, 41:3, 41:11, 41:24
**perceived** [1] - 36:22
**perception** [3] - 38:7, 40:10, 40:11
**peremptories** [1] - 12:2
**peremptory** [4] - 5:15, 8:5, 8:11, 25:20,

25:22, 27:1, 27:6, 27:8
**perhaps** [5] - 19:7, 41:10, 41:13, 42:14, 42:15
**permit** [1] - 40:22
**permitted** [2] - 8:11, 45:12
**person** [3] - 3:6, 22:25, 41:4
**personal** [2] - 14:10, 16:21
**personally** [1] - 19:2
**persons** [1] - 6:1
**perspective** [1] - 4:21
**pH** [4] - 32:9, 32:10, 32:12, 32:17
**phone** [1] - 45:2
**photographs** [12] - 20:21, 20:23, 21:7, 21:8, 22:10, 22:12, 22:22, 22:25, 23:2, 23:6, 24:18
**photos** [3] - 23:5, 29:17, 29:20
**pick** [3] - 11:20, 11:22, 18:24
**picked** [1] - 13:25
**picture** [1] - 42:22
**pictures** [5] - 21:24, 29:15, 41:12, 42:13, 42:25
**piece** [3] - 36:22, 40:15
**pieces** [1] - 42:25
**piled** [2] - 29:22, 29:23
**place** [1] - 35:2
**plan** [1] - 20:21
**plane** [2] - 46:20, 46:22
**plates** [1] - 35:14
**PMR** [6] - 15:4, 15:12, 15:16, 16:4, 16:5, 17:9
**point** [9] - 4:10, 5:8, 15:12, 21:22, 26:1, 32:20, 32:24, 33:2, 42:3
**points** [1] - 43:24
**poison** [2] - 29:19, 31:23
**policies** [1] - 18:13
**polished** [1] - 36:21
**portable** [1] - 10:25
**portion** [4] - 11:23, 19:23, 22:2, 33:14
**position** [1] - 21:24
**possible** [3] - 7:10, 16:2, 47:20
**potentially** [3] - 14:1,

14:16, 14:17
**PR** [1] - 41:24
**practical** [1] - 45:20
**practice** [3] - 7:3, 8:15, 24:18
**pre** [1] - 25:23
**preceding** [1] - 38:20
**preconceptions** [1] - 35:24
**predicated** [1] - 4:1
**predisposed** [1] - 25:23
**prefer** [4] - 7:3, 10:21, 11:7, 27:17
**preference** [3] - 6:24, 9:25, 10:18
**preferences** [1] - 10:16
**prejudice** [1] - 23:2
**prejudiced** [1] - 23:8
**prejudicial** [6] - 21:25, 22:4, 22:12, 22:21, 23:1
**preliminary** [9] - 3:22, 4:14, 4:16, 5:5, 5:9, 5:13, 9:19, 9:21, 12:4
**preparation** [4] - 4:2, 8:14, 17:18, 39:15
**prepare** [3] - 39:14, 39:16, 39:23
**prepared** [2] - 7:12, 48:2
**prescription** [1] - 18:23
**presence** [1] - 32:23
**present** [7] - 6:16, 7:10, 12:12, 19:16, 19:18, 27:12, 36:13
**presentation** [1] - 38:14
**presented** [5] - 36:5, 40:15, 43:19, 43:21, 45:9
**Preston** [1] - 35:20
**pretrial** [3] - 13:2, 13:11, 18:22
**preview** [1] - 39:6
**primary** [1] - 9:4
**prisoner** [4] - 15:4, 15:12, 15:16, 15:18
**private** [1] - 37:2
**problem** [2] - 7:1, 48:15
**problems** [2] - 37:11, 43:17
**procedural** [2] - 4:20, 21:4
**procedure** [1] - 17:1
**proceed** [6] - 5:18,

25:6, 27:11, 29:2, 29:7, 34:25
**proceeded** [1] - 30:25
**process** [3] - 16:12, 25:16, 45:19
**product** [1] - 40:2
**profession** [1] - 40:1
**professional** [1] - 39:12
**profit** [1] - 40:2
**prohibited** [5] - 30:15, 30:22, 33:8, 33:9, 34:12
**projects** [2] - 39:18, 39:19
**promises** [1] - 26:8
**promptly** [2] - 46:12, 46:25
**proof** [1] - 5:1
**proper** [1] - 22:17
**properly** [1] - 26:11
**property** [19] - 14:10, 16:21, 18:8, 23:22, 29:14, 29:23, 29:25, 30:2, 30:13, 30:16, 30:18, 30:25, 31:6, 31:11, 31:16, 33:22, 34:8, 40:9, 41:12
**proposing** [1] - 16:24
**prosecuted** [1] - 37:5
**Prospective** [4] - 3:3, 12:12, 19:16, 19:18
**prospective** [5] - 6:8, 6:20, 8:5, 12:5, 12:7
**prove** [2] - 34:3, 41:20
**provide** [1] - 44:18
**provided** [1] - 4:3
**provides** [2] - 7:18, 8:13
**proving** [2] - 34:5, 34:6
**publication** [1] - 22:1
**purpose** [4] - 11:1, 26:14, 26:18, 33:20
**purposes** [2] - 14:24, 23:3
**pursuant** [1] - 8:17
**push** [1] - 19:3
**put** [3] - 17:8, 25:11, 38:21
**puzzle** [1] - 43:1

**Q**

**Quality** [1] - 31:19
**questioning** [2] - 7:19, 12:1
**questions** [5] - 5:19, 7:23, 8:1, 9:19, 9:21
**quickly** [1] - 3:23

**quite** [1] - 38:5

**R**

**raise** [4] - 12:22, 26:4, 26:18, 37:18
**raised** [2] - 4:10, 17:4
**Randolph** [1] - 3:13
**Randy** [1] - 37:1
**rather** [5] - 7:3, 8:1, 34:5, 42:13, 43:22
**reach** [2] - 8:16, 34:14
**read** [25] - 4:17, 4:19, 4:22, 5:10, 6:6, 6:19, 7:1, 7:2, 7:3, 7:7, 7:12, 7:13, 8:25, 13:23, 28:15, 28:21, 43:12, 43:22, 44:4, 44:8, 48:4, 48:11, 48:14, 48:17, 48:23
**reading** [2] - 13:5, 32:16
**reads** [2] - 8:18, 47:7
**ready** [1] - 25:6
**real** [4] - 3:23, 7:19, 41:1
**realize** [1] - 26:14
**really** [8] - 4:11, 11:24, 21:22, 23:5, 38:11, 39:11, 41:2, 41:6
**reason** [2] - 9:3, 33:25
**reasonable** [2] - 5:2, 41:20
**receive** [4] - 43:4, 44:13, 45:23, 48:21
**received** [5] - 21:21, 21:23, 22:8
**recent** [1] - 48:6
**recently** [2] - 17:25, 48:2
**recess** [4] - 12:10, 24:25, 46:11, 49:4
**Recess** [4] - 12:11, 19:15, 19:17, 25:4
**recessed** [1] - 49:5
**recesses** [1] - 28:20
**recognizable** [1] - 36:14
**recognize** [2] - 37:15, 40:23
**record** [13] - 3:7, 4:5, 12:25, 14:25, 19:5, 24:10, 25:11, 26:14, 26:19, 26:21, 27:20, 34:19, 34:20
**records** [1] - 18:8
**reference** [3] - 16:10, 24:7, 24:16
**referring** [2] - 23:15, 23:16

**refinishing** [1] - 29:12
**regarding** [2] - 8:2, 45:22
**regardless** [1] - 38:3, 38:4
**related** [3] - 12:19, 30:4, 43:24
**relationship** [1] - 4:19
**relevant** [2] - 33:7
**religious** [1] - 44:10
**rely** [2] - 28:22, 47:9
**remember** [6] - 8:10, 28:16, 29:3, 37:4, 46:4, 47:17
**remind** [1] - 6:11
**remove** [1] - 8:7
**removed** [1] - 25:18
**renown** [1] - 37:7
**rented** [1] - 33:20
**repeat** [1] - 5:15
**replacement** [2] - 5:14, 9:8, 26:24
**replaces** [2] - 8:22, 8:23
**reporter** [1] - 24:24
**REPORTER** [1] - 25:1
**request** [4] - 15:4, 15:5, 15:13, 15:16
**requested** [1] - 15:17
**requests** [1] - 18:25
**required** [1] - 38:15
**requirement** [1] - 14:7
**requiring** [1] - 33:6
**research** [3] - 44:16, 44:25, 46:3
**reserving** [1] - 6:20
**resolve** [1] - 19:5
**respond** [3] - 25:17, 26:20, 26:23
**responded** [1] - 31:14
**responders** [3] - 31:25, 32:2, 32:3
**response** [3] - 17:5, 17:7
**responsibility** [1] - 42:15
**responsible** [1] - 33:11
**rest** [1] - 4:25
**result** [1] - 46:1
**resume** [1] - 12:16
**resumes** [1] - 41:3
**retain** [3] - 8:17, 8:19, 16:21
**retained** [3] - 8:20, 14:10, 16:23
**retires** [1] - 8:20
**returns** [1] - 25:9
**reviewing** [1] - 18:13

**revised** [1] - 3:25
**Rexburg** [8] - 23:20, 29:14, 29:25, 30:9, 30:13, 31:1, 31:6, 33:17
**room** [11] - 16:17, 20:5, 20:17, 26:10, 28:18, 28:21, 37:16, 39:10, 41:18, 44:22, 45:4
**routine** [1] - 4:18
**Rule** [7] - 7:17, 8:3, 8:4, 8:18, 27:2, 27:5
**rule** [2] - 8:12, 8:25
**rules** [1] - 4:20
**Rules** [1] - 7:17
**ruling** [2] - 23:4, 27:3
**run** [1] - 39:11
**rusted** [1] - 33:16
**rusting** [1] - 29:21

## S

**Salmon** [1] - 35:19
**samples** [2] - 32:4, 32:15
**sane** [1] - 34:6
**saw** [2] - 31:18, 35:12
**scale** [2] - 32:9, 32:18
**scene** [2] - 22:22, 22:24
**scientific** [1] - 44:10
**scrutinize** [1] - 43:3
**scrutiny** [1] - 38:8
**seat** [1] - 3:4
**seated** [4] - 19:25, 25:16, 27:16, 27:19
**Seattle** [4] - 14:10, 14:13, 16:22, 18:4
**second** [5] - 9:9, 16:5, 23:20, 25:19, 37:2
**see** [17] - 5:4, 16:1, 17:21, 19:5, 19:13, 21:7, 22:8, 23:9, 29:15, 29:17, 29:20, 33:17, 34:7, 37:14, 37:19, 38:13, 46:24
**seek** [1] - 44:13
**seem** [1] - 43:6
**selected** [2] - 9:7, 26:14
**selection** [9] - 4:16, 9:22, 9:24, 11:24, 12:19, 20:13, 25:12, 25:16, 35:18
**send** [1] - 15:12
**sense** [2] - 43:4, 46:8
**sent** [3] - 14:10, 15:17, 32:4
**serious** [6] - 35:9,

37:21, 37:23, 43:5
**seriously** [1] - 35:23, 43:7
**Service** [2] - 13:8, 18:6
**service** [3] - 44:12, 44:21, 44:22
**session** [1] - 20:9
**set** [6] - 3:25, 4:4, 5:6, 44:5, 47:3, 47:20
**Seth** [2] - 15:1, 17:1
**several** [2] - 31:7, 36:16
**severe** [1] - 26:7, 26:24, 45:25
**sharing** [1] - 19:8
**sheds** [1] - 29:24
**Sheriff's** [2] - 16:14, 31:14
**shoes** [1] - 42:20
**short** [1] - 46:13
**show** [4] - 30:14, 30:24, 31:15, 48:21
**showed** [1] - 35:12
**shown** [1] - 41:13
**shows** [1] - 33:7
**shut** [1] - 17:23
**side** [3] - 4:1, 8:4, 38:11
**sidebar** [3] - 7:22, 12:24, 12:25
**sides** [6] - 36:6, 36:7, 36:8, 36:9, 42:13, 47:14
**sights** [1] - 37:8
**silently** [1] - 36:25
**similar** [2] - 48:4, 48:5
**simple** [3] - 7:20, 38:6, 40:20
**simply** [4] - 18:1, 22:22, 24:11, 34:12
**single** [1] - 34:15
**site** [5] - 23:18, 31:15, 31:18, 31:24, 34:9
**sitting** [3] - 37:4, 37:5, 41:22
**situations** [2] - 36:6, 43:14
**sixties** [1] - 40:6
**skills** [1] - 41:25
**slick** [3] - 36:20, 41:24, 42:19
**small** [1] - 33:14
**smartphone** [1] - 44:20
**smells** [1] - 37:8
**smooth** [1] - 42:19
**snoop** [1] - 45:21
**snooping** [1] - 46:9
**social** [2] - 45:11, 48:3

**solely** [1] - 45:9
**someone** [1] - 25:20
**someplace** [2] - 30:9, 30:12
**somewhere** [1] - 23:19
**sons** [1] - 40:6
**soon** [2] - 30:24, 45:5
**sorry** [1] - 35:5
**sort** [4] - 7:21, 10:7, 10:8, 40:14
**sound** [4] - 13:20, 35:11, 36:20, 42:18
**sounded** [1] - 37:10
**sounds** [1] - 37:9
**spark** [1] - 37:9
**Spatig** [9] - 3:8, 3:13, 3:21, 12:21, 13:3, 19:6, 19:7, 23:14, 29:11
**Spatig's** [1] - 40:11
**speaking** [4] - 10:14, 10:17, 13:25, 18:19
**special** [3] - 3:25, 4:7, 4:8
**specialized** [1] - 39:5
**specially** [1] - 16:5
**specially-made** [1] - 16:5
**specifically** [1] - 15:22
**specified** [1] - 8:6
**spend** [1] - 33:25
**spent** [1] - 38:1
**staff** [1] - 5:24
**stage** [1] - 22:4
**stand** [5] - 10:9, 10:12, 10:23, 11:3, 11:7
**standard** [1] - 22:20
**standing** [1] - 41:25
**start** [10] - 13:10, 19:3, 19:23, 20:5, 25:2, 35:3, 46:9, 46:12, 46:23, 46:25
**started** [7] - 3:24, 9:21, 17:23, 37:7, 37:23, 37:24
**state** [2] - 31:23, 33:10
**statement** [8] - 20:22, 23:15, 23:18, 23:20, 24:13, 29:8, 34:22, 34:23
**statements** [20] - 9:25, 11:14, 11:21, 11:22, 19:22, 20:6, 20:21, 22:9, 23:12, 23:16, 23:17, 23:25, 24:7, 24:16, 25:7, 27:11, 29:3, 42:7
**States** [5] - 3:7, 3:10,

3:12, 15:1, 38:14
**stay** [2] - 35:1, 46:3
**step** [3] - 15:6, 15:19, 37:18
**steps** [2] - 16:3, 31:20
**stipulate** [1] - 22:7
**stipulated** [1] - 22:9
**stock** [1] - 48:2
**stopped** [1] - 17:12
**storage** [4] - 30:15, 31:8, 33:19, 33:20
**store** [1] - 29:13
**stored** [2] - 33:5, 41:12
**storing** [1] - 34:15
**story** [15] - 36:4, 36:7, 36:9, 36:10, 36:17, 36:22, 36:23, 38:5, 38:11, 38:12, 40:16, 42:14, 42:23
**strewn** [2] - 29:24, 31:10
**stripping** [1] - 39:23
**stroke** [3] - 38:17, 38:20, 39:20
**stuff** [16] - 23:19, 23:20, 30:8, 30:9, 30:11, 30:12, 30:13, 39:24, 39:25, 40:12, 40:22, 40:24, 41:5
**subject** [1] - 47:21
**submissions** [1] - 4:3
**substance** [2] - 32:22, 32:23
**suffice** [1] - 48:14
**sufficient** [1] - 25:19
**suggest** [2] - 19:7, 33:23
**suggestion** [1] - 27:14
**suggests** [1] - 48:6
**suitable** [1] - 33:19
**summary** [1] - 5:16
**Sunday** [1] - 46:23
**supply** [2] - 15:18, 48:8
**surface** [1] - 39:16
**surrounding** [1] - 38:5
**sworn/impaneled** [1] - 19:19
**system** [7] - 13:20, 25:21, 26:2, 26:15, 27:7, 45:14

## T

**table** [5] - 3:14, 6:1, 10:8, 10:22, 11:8
**technical** [1] - 44:10
**telephone** [1] - 44:20
**television** [1] - 41:24

**temperature** [1] - 32:21
**tempted** [1] - 37:18
**tempting** [1] - 46:8
**ten** [1] - 26:25
**tendency** [1] - 10:11
**tends** [1] - 35:11
**test** [2] - 31:25, 40:18
**tested** [4] - 15:14, 16:4, 32:14, 33:2
**testifies** [1] - 38:14
**testify** [4] - 4:25, 7:9, 23:25, 24:4
**testimony** [2] - 24:11, 24:17
**texts** [1] - 44:21
**thanking** [1] - 35:21
**THE** [85] - 3:4, 3:14, 3:18, 3:21, 6:5, 6:11, 7:2, 7:7, 9:16, 9:18, 10:2, 10:20, 10:23, 11:3, 11:10, 11:17, 12:10, 12:13, 12:19, 12:23, 13:1, 13:7, 14:22, 14:24, 15:25, 16:3, 16:13, 16:24, 17:15, 17:16, 17:17, 19:3, 19:12, 19:20, 20:3, 20:4, 20:10, 20:12, 20:15, 20:19, 20:23, 21:1, 21:6, 21:10, 21:12, 21:14, 21:19, 22:6, 22:19, 23:3, 23:14, 23:24, 24:2, 24:14, 24:23, 25:1, 25:2, 25:6, 25:10, 25:13, 26:20, 26:23, 27:13, 27:21, 28:1, 28:3, 28:6, 28:12, 34:18, 34:21, 34:25, 35:4, 35:6, 42:4, 43:11, 47:3, 47:17, 47:24, 48:4, 48:9, 48:13, 48:17, 48:21, 49:1, 49:4
**themselves** [1] - 9:1
**thinner** [1] - 39:22
**third** [2] - 6:18, 7:11
**third-party** [2] - 6:18, 7:11
**thousands** [1] - 29:13
**three** [3] - 4:9, 27:22, 28:10
**throughout** [5] - 29:15, 29:22, 29:25, 30:5, 30:20
**throw** [2] - 39:25, 40:11
**Thursday** [3] - 17:21, 46:18, 47:18

**tied** [1] - 11:11
**today** [6] - 11:19, 11:20, 19:23, 29:11, 41:23, 42:15
**Todd** [1] - 31:5
**together** [1] - 48:1
**tomorrow** [5] - 19:24, 46:12, 46:17, 46:25, 49:2
**took** [4] - 22:25, 30:8, 31:16, 47:9
**totally** [2] - 10:13, 12:2
**touch** [1] - 37:19
**towards** [2] - 25:23, 25:24
**transferred** [4] - 16:22, 17:10, 17:15, 17:24
**traveled** [1] - 35:16
**treat** [2] - 30:23, 33:13
**treated** [1] - 34:8
**tremendous** [1] - 35:17
**trial** [16] - 3:19, 4:2, 4:6, 4:12, 8:14, 8:16, 17:18, 19:24, 29:15, 30:5, 32:21, 42:11, 46:17, 46:18, 47:8, 48:6
**trials** [4] - 8:15, 22:6, 22:7, 37:8
**trucks** [1] - 40:5
**true** [1] - 19:2
**truth** [4] - 36:10, 38:12, 42:24
**try** [2] - 18:14, 33:23
**trying** [3] - 18:13, 19:10, 36:13
**tubes** [1] - 40:18
**Tuesday** [1] - 17:20
**turn** [1] - 5:25
**Twitter** [1] - 44:23
**two** [22] - 8:8, 8:11, 13:6, 14:6, 14:14, 14:20, 16:3, 17:2, 17:4, 23:17, 27:22, 27:23, 28:4, 32:6, 36:6, 36:7, 36:8, 36:9, 41:22, 42:13, 43:24, 48:10
**two-month** [1] - 17:2
**type** [1] - 44:11

## U

**U.S** [1] - 18:6
**ultimately** [3] - 13:23, 23:9, 42:19
**unable** [1] - 13:4
**under** [1] - 21:3

**unduly** [1] - 22:21
**unfair** [1] - 23:2
**unfairly** [2] - 22:21, 45:18
**unfortunately** [1] - 3:5
**United** [5] - 3:7, 3:10, 3:12, 15:1, 38:14
**unless** [3] - 7:19, 18:20, 24:19
**unpermanent** [1] - 34:8
**unring** [1] - 22:5
**unseen** [1] - 43:4
**up** [22] - 5:19, 7:22, 7:23, 10:14, 12:2, 12:24, 13:9, 13:12, 13:14, 14:1, 16:22, 18:24, 23:22, 24:5, 26:25, 27:3, 27:14, 27:15, 29:22, 33:6, 35:12, 38:24
**upset** [1] - 26:17

## V

**valid** [1] - 24:12
**vapors** [1] - 32:22
**vehicles** [1] - 29:23
**verbally** [1] - 23:7
**verdict** [9] - 3:25, 4:7, 4:8, 25:24, 26:7, 26:9, 34:14, 34:15, 45:1
**verify** [1] - 15:15
**version** [1] - 17:9
**video** [2] - 3:6, 31:15
**views** [1] - 23:1
**violation** [2] - 27:5, 45:6
**visited** [1] - 30:20
**visiting** [1] - 5:23
**voice** [7] - 42:9, 42:14, 42:15, 42:17, 42:18, 42:19, 43:8
**voiced** [1] - 23:2
**voices** [1] - 36:15, 36:16, 36:19, 36:24, 37:14, 38:9, 41:10, 41:11, 42:12, 43:9
**voir** [5] - 7:16, 7:21, 12:12, 19:16, 19:18
**volume** [1] - 13:25
**vs** [1] - 3:7

## W

**wait** [1] - 27:18
**walk** [1] - 27:16
**wandering** [1] - 35:3
**wants** [1] - 7:1

**warn** [1] - 46:8
**waste** [27] - 29:14, 29:16, 29:17, 29:19, 29:20, 30:1, 30:10, 30:15, 30:23, 31:21, 32:6, 32:7, 32:8, 32:9, 32:14, 32:15, 32:19, 33:6, 33:13, 33:15, 34:8, 34:10, 34:16, 38:25, 40:25, 41:5
**wastes** [2] - 32:6, 33:1
**watch** [1] - 36:19
**weak** [1] - 42:18
**website** [2] - 44:15, 44:23
**Wednesday** [1] - 46:18
**weeds** [1] - 29:21
**week** [4] - 13:16, 17:20, 46:24, 47:21
**weeks** [4] - 14:6, 14:14, 14:20, 17:5
**whatsoever** [1] - 14:11
**widower** [2] - 38:17, 40:21
**wife** [4] - 38:17, 38:20, 38:22, 39:19
**Wikipedia** [1] - 44:15
**Winmill** [1] - 4:18
**wish** [3] - 26:20, 28:16, 34:23
**witness** [7] - 3:19, 6:25, 23:25, 24:4, 30:6, 30:8, 46:17
**witnesses** [17] - 6:7, 6:16, 6:18, 6:21, 7:4, 7:5, 7:8, 7:10, 7:11, 7:12, 7:13, 22:23, 24:17, 31:2, 36:16, 42:12
**words** [3] - 38:25, 45:1, 46:10
**works** [2] - 27:9, 31:13
**worth** [1] - 26:24

## Y

**years** [6] - 23:23, 31:6, 37:3, 38:16, 38:19, 40:13
**yesterday** [3] - 17:15, 17:18, 17:23
**yourself** [1] - 28:17
**yourselves** [1] - 44:1
**YouTube** [1] - 44:23

## Z

**zero** [4] - 18:10, 18:25, 32:10, 32:16
**zoning** [1] - 41:8